[No. B048719. Second Dist., Div. Three. Dec. 3, 1990.]

STEPHANIE NORDLINGER, Plaintiff and Appellant, v.
JOHN J. LYNCH, as Tax Assessor, etc., et al., Defendants and
Respondents.

COUNSEL

Brent N. Rushforth, Hall & Phillips, Carlyle W. Hall, Jr., Mary Louise Cohen and Ann E. Carlson for Plaintiff and Appellant.

Ajalat & Polley, Charles R. Ajalat, Terry L. Polley, Richard J. Ayoob, Mayer, Brown & Platt, Michael W. McConnell, Howarth & Smith, Don Howarth, Barash & Hill, Alexander H. Pope, T. Larry Watts, Richard A. Kolber and William K. Rentz as Amici Curiae on behalf of Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, David L. Muir, Deputy County Counsel, and Albert Ramseyer, County Counsel, for Defendants and Respondents.

John K. Van de Kamp, Attorney General, Arthur C. De Goede, Assistant Attorney General, Ronald A. Zumbrun, Anthony T. Caso, Jonathan M. Coupal and Trevor A. Grimm as Amici Curiae on behalf of Defendants and Respondents.

OPINION

KLEIN, P. J.—Plaintiff and appellant Stephanie Nordlinger (Nordlinger) appeals an order of dismissal following the sustaining without leave to amend of a demurrer to her first amended complaint. The demurrer was interposed by defendants and respondents John J. Lynch in his capacity as Tax Assessor for Los Angeles County (the Assessor) and the County of Los Angeles (sometimes collectively referred to as the Assessor).

SUMMARY STATEMENT

A dozen years have elapsed since California voters launched the so-called "tax revolt" and adopted Proposition 13 by a wide margin, adding article XIII A to the California Constitution.[1] In the intervening years, some disenchantment has set in with the "welcome stranger" clause, which bases real property assessments on acquisition cost rather than on current value. Generally, this system disproportionately burdens recent purchasers of real property, whose property is assessed at full current value, and favors long-time property owners, whose assessments reflect their outdated acquisition values. Articles and editorials have questioned the fairness of the acquisition value approach, especially as to younger persons, first-time home buyers and newcomers to the state.

While disillusionment with Proposition 13 and the welcome stranger aspect in particular has been mounting, it was the recent United States Supreme Court opinion in *Allegheny Pittsburgh Coal* v. *Webster County* (1989) 488 U.S. 336 [102 L.Ed.2d 688, 109 S.Ct. 633] (*Allegheny*), which provided the impetus for the present attack on Proposition 13. Some of the language used by the court in *Allegheny* has emboldened the Proposition 13 critics. They rely on such phrases as "[t]he constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." (488 U.S. at p. 343 [102 L.Ed.2d at p. 697.) They also invoke *Allegheny*'s related requirement "to seasonably dissipate the remaining disparity between [older] assessments and the assessments

---

[1] All further article and section references are to the California Constitution, unless otherwise specified.

based on a recent purchase price." (488 U.S. at p. 344 [102 L.Ed.2d at p. 697]) Observers additionally point to *Allegheny*'s pronouncement that " '[i]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of [those] taxed upon the full value of [their] property.' " (488 U.S. at p. 345 [102 L.Ed.2d at p. 698.)

Taken out of context, these statements appear to apply to the fact situation brought before this court by the plaintiff herein, Nordlinger, and the amici curiae on her behalf.[2] This challenge has compelled this court to consider whether Allegheny has undermined *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador*), wherein the California Supreme Court upheld the constitutionality of article XIII A.

After a thorough analysis, we conclude *Allegheny* does not prohibit the states from adopting an acquisition value assessment method. *That decision merely prohibits the arbitrary enforcement of a current value assessment method.* Because *Allegheny* is inapposite, *Amador* remains controlling. Any modification of the provisions of Proposition 13 is for the political process, not the courts. The order of dismissal therefore is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Key provisions of article XIII A in controversy.*

At the June 1978 primary election, the electorate adopted Proposition 13, thereby adding article XIII A to the California Constitution. The initiative measure changed the system of real property taxation and imposed important limitations upon the assessment and taxing powers of state and local governments. (*Amador, supra*, 22 Cal.3d at p. 218.)

Article XIII A provides in relevant part at section 1: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property."

The article defines "full cash value" in two ways: "the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' *or, thereafter*, the appraised value of real property when purchased,

---

[2] Amicus curiae briefs in support of Nordlinger have been filed by the Building Industry Association of Southern California, Inc., and attorneys William K. Rentz and Charles R. Ajalat.

The State Board of Equalization, Howard Jarvis Taxpayers Association, and Paul Gann's Citizen's Committee have filed amicus curiae briefs in support of the Assessor.

newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation." (Art. XIII A, § 2, subd. (a), italics added.)

The full cash value base thereafter may be adjusted to "reflect from year to year the inflationary rate not to exceed 2 percent for any given year . . . , or may be reduced to reflect . . . a decline in value." (Art. XIII A, § 2, subd. (b).)

*2. The reassessment of Nordlinger's home reflected the acquisition cost.*

As gleaned from the papers filed, Nordlinger purchased her first home on November 1, 1988, after living in rental property for 25 years and saving her money. She paid $170,000 for the subject property, located in the Baldwin Hills area of Los Angeles. The residence is part of a tract of single family homes which was developed in 1947. It measures 1,114 square feet and is situated on a 8,200-square-foot lot.

The previous owners, the Smiths, had purchased the property in 1986 for $121,500. While the Smiths owned the property, its assessed value was based on their $121,500 purchase price. In early 1989, the Assessor sent Nordlinger a notice of assessed value change and a joint consolidated supplemental tax bill which reflected a reassessment of the property to the new acquisition value of $170,000. The ownership change resulted in a tax increase on an annual basis of $454.

Nordlinger paid the tax bill "under protest." She then unsuccessfully filed a verified application for reduction of assessment and claim for refund with the Assessment Appeals Board.

*3. The complaints.*

After filing an original complaint on September 28, 1989, Nordlinger filed a first amended complaint against the Assessor on October 25, 1989, seeking declaratory relief pursuant to Revenue and Taxation Code section 4808[3] and a refund of property taxes. We summarize the essential allegations as follows:

---

[3] Revenue and Taxation Code section 4808 allows any taxpayer to seek declaratory relief alleging the locally assessed property taxes have been illegally or unconstitutionally assessed or collected. The section is applicable only in instances where the alleged illegality occurred "as the direct result of a change in . . . law that became effective not more than 12 months prior to the date the action is initiated by the taxpayer." (Rev. & Tax. Code, § 4808.)

The fair assessed value of Nordlinger's property was $30,000, taking into account the assessment of comparable properties in the neighborhood. For example, one neighbor's home contains square footage identical to Nordlinger's and sits on a lot which is 900 square feet larger than Nordlinger's. That home is assessed at $35,820 based on its 1975 valuation. Another neighbor's home is 44 square feet greater than Nordlinger's on a lot 1,040 square feet larger than Nordlinger's. That home is assessed at $36,107 based on its 1975 valuation. Thus, Nordlinger's annual property tax is nearly five times that paid by these neighbors on their comparable properties.

The examples reveal the welcome stranger approach of Proposition 13 has resulted in gross disparities in the assessed values of generally comparable properties. In 1978, immediately after the adoption of Proposition 13, the tax disparity between similar properties purchased in 1978 and those owned since 1975-1976 was approximately 1.4 to 1. In 1989, the disproportionate assessments averaged 5 to 1 in Los Angeles County, while in certain neighborhoods, such as Venice, the disparity was 15 to 1, or more. As property values increase in the future, Proposition 13's discriminatory impact against more recent purchasers will be magnified.

Proposition 13 was promoted as a means of limiting government spending and making property taxes fair and within the ability of taxpayers to pay. However, it created an arbitrary system which imposed disparate tax burdens on owners of similarly situated properties without regard to the use of the real property, the burden the property placed on the government, the actual value of the property, or the financial means of the property owner.

The first cause of action sought a declaratory judgment that article XIII A is unconstitutional insofar as it requires owners of similarly situated properties to be taxed disparately.

The second cause of action sought an $896 refund of property taxes for 1988-1989.

4. *The demurrer.*

The Assessor demurred to both causes of action on the ground *Amador* had determined the provisions of article XIII A do not violate the equal protection guarantees of the state and federal Constitutions.

The Assessor also demurred to the first cause of action on the ground it was time-barred because the original complaint was not filed within 12 months after article XIII A became effective, as required by Revenue and Taxation Code section 4808.

5. *Nordlinger's opposition papers.*

Nordlinger's opposition memorandum maintained *Amador* was not controlling because it merely involved a facial challenge to Proposition 13 shortly after its adoption, and no evidence of actual disparities was presented in that case. Nordlinger further contended the dramatic disparities created by Proposition 13's welcome stranger tax assessment method had been rendered unconstitutional by *Allegheny*. In addition, the Revenue and Taxation Code section 4808 claim was timely because the action was filed within nine months of *Allegheny*, which effectively superseded *Amador*.

Alternatively, Nordlinger urged that if the trial court were to sustain the demurrer, she should be permitted to amend her complaint to include allegations based on further updated and extensive studies of property tax inequities in Los Angeles County. Allegations based on those studies would demonstrate the level of disparities generated by Proposition 13 between longtime property owners and recent purchasers of similarly situated real property range as high as 500 to 1 for unimproved parcels.

The proposed amendment also would allege Proposition 13 treats very different taxpayers as similar; consequently, in 1988 her modest Baldwin Hills tract home was assessed at virtually the same value as a Malibu beachfront home worth $2.1 million, 12 times more than her home, but purchased prior to 1976. Finally, the amended pleading would describe in detail Proposition 13's burden on interstate travel, which burdens could not be justified by any compelling state interest.

 a. *Evidence of gross disparity between pre-1975 owners and new purchasers of property to support proposed second amended complaint.*

Nordlinger's extensive opposition memorandum was supported by ample evidence of the distortions created by Proposition 13 and expanded on the allegations set forth in her complaint.

Her papers included, inter alia, the declaration of David Gold, a consultant. Gold conducted an economic study to evaluate the magnitude of real property tax disparities between Nordlinger's property and similar neighboring properties acquired before 1975, as well as disparities in other neighborhoods within Los Angeles County.

Gold determined Nordlinger paid approximately five times more in property taxes than the average paid by the owners of eighteen similar neighboring properties. Further, the disproportionate assessments in many

neighborhoods were even greater. For example, in Venice, the ratio of the tax paid by a 1989 purchaser to the tax paid on a comparable home by a pre-1975 owner was 13:1. In Beverly Hills, the ratio was 12:1. Gold observed these disparities would become even more pronounced over time. He projected that even if the annual rate of appreciation in home values were to drop to 9.5 percent, a 13 to 1 differential would increase to 26 to 1 in just 10 years.

Gold observed that not only are individuals who own comparable homes taxed at disparate levels, but properties that vary greatly in value are taxed at similar levels. Due to Proposition 13's welcome stranger approach, the owner of a 7,800-square-foot, 7-bedroom residence on a 28,000-square-foot lot in Beverly Hills paid less in property tax than the owner of a 980-square-foot Venice home on a 3,100-square-foot lot.

Gold found additional disparity in that the property tax on longtime owners had fallen by 38 percent in real terms because Proposition 13 allows at most a 2 percent annual increase in assessments, far below the rate of inflation. In 1978, the median price of an existing home in Los Angeles County was about $68,600. Its general property tax levy based on 1 percent of that value was $686. With a 2 percent annual increase, the 1989 tax bill on such property was $852. Had the original $686 tax bill kept pace with inflation, the 1989 tax bill would have been $1,372.

Nordlinger also offered the declaration of Robyn S. Phillips, an assistant professor of economics. A related exhibit indicates that in 1989, only 38 percent of single family residences in Los Angeles County had a 1975 base year value. That percentage had fallen from 45.2 percent three years earlier. Phillips concluded that for all single family homes in the county in 1989, the average assessed value was 44 percent of market value.[4]

Nordlinger also submitted a supporting declaration by Alexander H. Pope who served as tax assessor for the county between 1978 and 1986. According to Pope, there were many vacant lots on the tax rolls assessed at a 1975 base-year value of less than $1,000. Those values were depressed because the lots were unbuildable hillside or canyon lots, or lacked road access, or the required Coastal Commission permits were unattainable. Many of the properties are now worth $100,000 or more because construction technology has improved, roads have been built, and Coastal Commission permits are more readily available.

---

[4] Based thereon, Nordlinger submits that if all properties were reassessed to current market value, the county could lower its residential property tax rate from 1.0 percent to 0.44 percent without any loss in tax revenues.

b. *The proposed second amended complaint.*

The proposed second amended complaint set forth detailed factual allegations of disparity. It additionally pled, inter alia, that most people move due to necessity involving marriage, divorce, the death of a spouse, alteration of family size or a job change. Thus, Proposition 13 discriminates against new home purchasers in favor of longtime homeowners. It also discourages and penalizes individuals who wish to migrate within California or to migrate here from other states. Further, it penalizes those individuals who were not old enough to own property in 1975 and those who lacked the means to do so.

6. *The Assessor's reply memorandum.*

The Assessor argued Nordlinger's equal protection and right to travel challenges were disposed of by *Amador*. Article XIII A met the rational basis test because it protected homeowners on fixed incomes, including disabled and retired persons, from being taxed on the appreciated value of their homes. In addition, Proposition 13 was rational because it allowed a new purchaser to predict the future taxes on the property.

Further, Nordlinger's other constitutional argument was unavailing because the right to travel guaranty only precludes the discriminatory distribution of government benefits. In addition, Nordlinger's Revenue and Taxation Code section 4808 claim was time-barred because *Allegheny* did not address Proposition 13 and therefore did not result in a change of law.

7. *The trial court's ruling.*

The matter was heard on January 29, 1990. By stipulation, the demurrer was deemed to have been brought by both named defendants. Citing *Amador* and Revenue and Taxation Code section 4808, the trial court sustained the demurrer without leave to amend on the grounds stated in the moving papers and ordered dismissal of the first amended complaint. The order of dismissal was filed on February 23, 1990. This appeal followed.

CONTENTIONS

Nordlinger contends: (1) *Amador* is not controlling because gross tax disparities among comparable property owners had not yet developed and merely a facial attack on Proposition 13 was presented to that court; (2) *Allegheny* invalidates a welcome stranger approach that imposes grossly disproportionate taxes on similarly situated property taxpayers; (3) because *Allegheny* is on point, it is binding on this court notwithstanding *Amador*;

and (4) article XIII A is infirm because it impedes interstate and intrastate travel without a compelling state interest.[5]

## DISCUSSION

### 1. *Standard of appellate review.*

The function of a demurrer is to test the sufficiency of a pleading by raising questions of law. (*Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 818 [164 Cal.Rptr. 264].) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) The allegations are regarded as true and are liberally construed with a view to attaining substantial justice. (*Shaeffer* v. *State of California* (1970) 3 Cal.App.3d 348, 354 [83 Cal.Rptr. 347]; *King* v. *Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].)

In addition, relevant matters which are properly the subject of judicial notice may be treated as having been pled. (*Helix Land Co.* v. *City of San Diego* (1978) 82 Cal.App.3d 932, 937 [147 Cal.Rptr. 683].) Because we find it is not reasonably disputable that article XIII A has resulted in gross disparities in the assessments of properties with similar current market values, we take judicial notice of that fact and treat it as having been pled. (Evid. Code, §§ 452, subd. (h), 459.) We thereafter consider whether *Allegheny* renders such alleged disparities constitutionally infirm.

Where, as here, a demurrer is sustained without leave to amend, we decide whether there is a reasonable possibility the defect can be cured by amendment. If not, there has been no abuse of discretion and we must affirm. (*Blank* v. *Kirwan, supra,* 39 Cal.3d at p. 318.)

### 2. *The Amador decision.*

The California Supreme Court rendered its decision in *Amador* in September 1978, just three months after the adoption of Proposition 13. The petitioners therein, who were various governmental agencies and concerned citizens, alleged actual or potential adverse effects resulting from the

---

[5] The extensive briefing by amici curiae largely reiterates the respective arguments of the parties, which we discuss *infra.* Additionally, Attorney Ajalat's brief urges article XIII A, section 2, violates the commerce clause of the federal Constitution. (U.S. Const., art. I, § 8.) Said issue is presently pending in the First District Court of Appeal in *R. H. Macy & Co., Inc.* v. *Contra Costa County* (No. A049789), which case involves commercial real property. (Evid. Code, §§ 452, subd. (d), 459.) However, the commerce clause issue is outside the scope of homeowner Nordlinger's action and we do not reach it.

adoption and operation of the article. (*Amador, supra*, 22 Cal.3d at pp. 218-219.) They raised multiple constitutional challenges, including contentions based on the federal equal protection clause (U.S. Const., 14th Amend., § 1), and the right to travel (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]). (*Amador, supra*, at pp. 232-238.) The Supreme Court concluded article XIII A survived each of the substantial challenges which had been raised and denied the petitions. (*Id.*, at p. 248.)

### a. *Equal protection of the laws.*

The *Amador* petitioners argued the rollback of assessed valuation to the 1975-1976 fiscal year would result in invidious discrimination among owners of similarly situated property. By reason of the rollback provision, two substantially identical homes located side-by-side and receiving identical governmental services, could be assessed and taxed at different levels depending on their date of acquisition. Petitioners contended such a disparity in tax treatment constituted arbitrary discrimination in violation of the federal equal protection clause. (*Amador, supra*, 22 Cal.3d at pp. 232-233.)

Preliminarily, the Supreme Court observed the equal protection challenge "arguably, is premature . . . , and we could decline to consider the issue in the abstract and instead await its resolution within the framework of an actual controversy wherein the disparity is pivotal." (*Amador, supra*, 22 Cal.3d at p. 233.) Nonetheless, the Supreme Court chose to reach the merits, "elect[ing] to treat the equal protection issue as constituting an attack upon the face of the article itself, because the assessors throughout this state must be advised whether to follow the new assessment procedure." (*Ibid.*)

██ *Amador* recognized the equal protection challenge required it to scrutinize article XIII A under the deferential rational basis standard. (*Amador*, 22 Cal.3d at p. 233.) Under that standard, so long as a system of taxation "is supported by a rational basis, and is not palpably arbitrary," it will be upheld. (*Id.*, at p. 234; *Kahn* v. *Shevin* (1974) 416 U.S. 351, 356, fn. 10 [40 L.Ed.2d 189, 193-194, 94 S.Ct. 1734]; *Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 527 [3 L.Ed.2d 480, 484-485, 79 S.Ct. 437].) Further, a state tax law is not arbitrary although it discriminates in favor of a certain class if the discrimination is founded upon " ' "a reasonable distinction, or difference in state policy," not in conflict with the Federal Constitution.' " (*Amador, supra*, 22 Cal.3d at p. 234; *Kahn* v. *Shevin, supra*, 416 U.S. at pp. 355-356 [40 L.Ed.2d at pp. 193-194].)

Petitioners relied upon a line of cases which held, as a general proposition, that the *intentional, systematic undervaluation* of property similarly

situated with other property assessed at its full value amounted to a deprivation of equal protection. (*Amador, supra,* 22 Cal.3d at p. 234; see *Cumberland Coal Co.* v. *Board* (1931) 284 U.S. 23, 28 [76 L.Ed. 146, 149-150, 52 S.Ct. 48]; *Sioux City Bridge* v. *Dakota County* (1923) 260 U.S. 441, 445 [67 L.Ed. 340, 342-343, 43 S.Ct. 190, 28 A.L.R. 979]; *Hillsborough* v. *Cromwell* (1946) 326 U.S. 620, 623 [90 L.Ed. 358, 363, 66 S.Ct. 445].)

*Amador* held those cases arising in other jurisdictions were inapposite because they involved constitutional or statutory provisions which *mandated* the taxation of property on a *current value* basis, while article XIII A provides that all property, except property acquired prior to 1975, is to be assessed at its *acquisition value.* (*Amador, supra,* 22 Cal.3d at p. 235.) Further, the states were not confined to a current value system under equal protection principles. (*Id.,* at pp. 235-237.) Thus, an acquisition value system will be sustained if it is founded upon some rational basis. (*Id.,* at p. 235.)

*Amador* found a rational basis for the acquisition value approach. Such assessment method relates the annual tax to the original cost of the property rather than to an unforeseen and perhaps unduly inflated current value. It also allows each property owner to estimate future tax liability with substantial certainty. (*Amador, supra,* 22 Cal.3d at p. 235.) Further, the acquisition value approach of article XIII A was not unique in concept. Sales tax on personal property similarly is based on acquisition cost. Thus, two consumers may pay different taxes on substantially identical personal property, depending upon the exact sales price and the availability of a discount. (*Id.,* at pp. 235-236.)

Moreover, the acquisition value approach was rational despite the fact article XIII A deems persons who acquired property prior to 1975 to have purchased it during 1975. While the selection of the 1975-1976 fiscal year as a base year was seemingly arbitrary, it was comparable to a grandfather clause and an earlier cut off date reasonably might have been considered both administratively unfeasible and incapable of producing adequate tax revenues. (*Amador, supra,* 22 Cal.3d at p. 236.)

In sum, there is no requirement that property of equal current value must be taxed equally, regardless of its original cost. (*Amador, supra,* 22 Cal.3d at p. 236.) Because an acquisition value approach, by which a property owner's tax liability bears a reasonable relation to the acquisition cost, is neither wholly arbitrary nor irrational, article XIII A met the demands of the equal protection clause. (*Id.,* at p. 237.)

### b. *Alleged right to travel impairment.*

The *Amador* petitioners also contended article XIII A would impair the fundamental right to travel because nonresidents or newly arrived residents would be subject to higher property taxes than established residents. As a result, property owners would be deterred from relocating. (*Amador, supra,* 22 Cal.3d at p. 237.)[6]

*Amador* rejected the right to travel challenge, observing travel was no more inhibited under the new system which established a more fixed and stable measure of taxes, than under the former system. The change from a current value system to an acquisition system was intended to benefit all property owners, past and future, resident and nonresident, by reducing inflationary pressures in assessments, by limiting tax rates, and by permitting the taxpayer to make a more careful and accurate prediction of future tax liability. (*Amador, supra,* 22 Cal.3d at p. 238.)

### 3. *Amador binding on this court unless Allegheny is directly on point.*

■ We are unpersuaded by Nordlinger's argument this court is not bound by *Amador*'s rejection of the equal protection and right to travel challenges because that case involved a mere facial attack on article XIII A's welcome stranger provision without any evidence of actual disparities.

First and foremost, while *Amador* found the equal protection contention "arguably . . . premature," it proceeded to rule on the merits of the issue after expressly "declin[ing] to . . . await its resolution within the framework of an actual controversy . . . ." (*Amador, supra,* 22 Cal.3d at p. 233.)

In addition, it can hardly be said the present disparities complained of by Nordlinger and offered in great detail in her pleadings were totally unforeseen by the *Amador* court. That decision plainly anticipated disparities in assessments of comparable properties would increase over time. In discussing the impact of an acquisition cost approach, *Amador* quite specifically recognized a property acquired in 1977 for $80,000 would incur double the

---

[6] The *Amador* petitioners relied on *Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d at page 602, which held legislation is subject to strict scrutiny if it directly burdens the right to travel by distinguishing between nonresidents or newly arrived residents on the one hand and established residents on the other and imposing penalties and disabilities on the former group. However, legislation which does not penalize travel but merely makes it more difficult for the outsider to establish a residence in the place of his or her choosing is scrutinized under a rational relationship test. (*Id.,* at pp. 602-604; see *Amador, supra,* 22 Cal.3d at p. 237.)

tax of a similar property acquired just two years earlier for $40,000. (*Amador, supra*, 22 Cal.3d at p. 235.) The *Amador* decision is not rendered invalid by the fact the expected disparities generated by article XIII A have since materialized.

Further, the binding force of *Amador* is not diminished by any unfairness which has developed from the acquisition value system. In upholding article XIII A against the equal protection challenge, *Amador* alluded to fairness as an ingredient of equal protection and observed an acquisition value system "may operate on a *fairer* basis than a current value approach." (*Amador, supra*, 22 Cal.3d at p. 235, italics added.) If article XIII A has turned out to be unfair as forcefully argued by Nordlinger and the amici curiae on her side, a revisiting of *Amador* may be deemed appropriate. However, *Amador*'s failure to perceive any potential unfairness of an acquisition value approach does not permit this court to depart from that decision.

Therefore, unless the United States Supreme Court's subsequent decision in *Allegheny* is *directly on point*, we are bound by the California Supreme Court' decision in *Amador* upholding article XIII A against federal constitutional challenges based on equal protection and the right to travel. (*Birkhofer v. Krumm* (1938) 27 Cal.App.2d 513, 536-537 [81 P.2d 609].)

■ In *Birkhofer*, as here, the Court of Appeal was urged to diverge from California Supreme Court authority due to developments in United States Supreme Court decisional law. *Birkhofer* declined to depart from California precedent, explaining it is the function of the California Supreme Court, rather "than of any state court subordinate to it, to announce changes in what has hitherto been treated within the state as the settled law with respect to constitutionality [under the United States Constitution] of a given application of a state statute, *unless indeed there be so exact a parallel between a particular case presented and a controlling decision of a federal court,* that no reasonable distinction between them can be made." (*Birkhofer v. Krumm, supra*, 27 Cal.App.2d at pp. 536-537, italics added.)

Thus, "[w]e are not permitted to violate stare decisis for the sake of straws in the wind. Our duty as an intermediate appellate court is to follow the decisional law laid down by the state Supreme Court. We violate jurisdictional bounds when we do otherwise. (*Auto Equity Sales, Inc. v. Superior Court* [1962] 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)" (*Beckman v. Mayhew* (1975) 49 Cal.App.3d 529, 535 [122 Cal.Rptr. 604].)

With these principles in mind, we turn to the *Allegheny* decision.

4. *Allegheny case summary.*

The West Virginia Constitution guarantees to its citizens that with certain exceptions, "taxation shall be *equal and uniform* throughout the State, and all property, both real and personal, shall be *taxed in proportion to its value* . . . ." (W.Va. Const., art. X, § 1, italics added.)

Notwithstanding this principle of uniformity, the tax assessor of West Virginia's Webster County valued the properties of petitioner coal companies on the basis of their recent purchase price but made only minor modifications in the assessments of comparable land which had not been recently sold. The assessor fixed yearly assessments for property within the county at 50 percent of appraised value, and determined appraised value by using the declared consideration at which a property was last sold. This practice resulted in gross disparities in the assessed value of generally comparable properties. Petitioners' properties were assessed at 8 to 35 times the value of comparable properties which had not recently changed hands. As to certain property, the county's gradual adjustment policy would have required more than 500 years to equalize the assessments. (*Allegheny, supra,* 488 U.S. at pp. 337-347 [102 L.Ed.2d at pp. 693-696].)

To resist petitioners' equal protection challenge, Webster County argued its assessment scheme was rationally related to its purpose of assessing properties at true current value. When available, it made use of accurate information about the market value of a property—the price at which it was recently purchased. As that data grew stale, it periodically adjusted the assessment based on some perception of the general change in local property values. (*Allegheny, supra,* 488 U.S. at p. 343 [102 L.Ed.2d at pp. 696-697].)

*Allegheny* rejected Webster County's proffered rationale, observing that the equal protection clause prohibits " 'taxation which in fact bears unequally on persons or property of the same class.' " (*Allegheny, supra,* 488 U.S. at p. 343 [102 L.Ed.2d at p. 697].) West Virginia's Constitution and laws provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the state according to its estimated market value. (488 U.S. at p. 345 [102 L.Ed.2d at p. 698.) Use of a general adjustment as a transitional substitute for an individual reappraisal did not violate equal protection as long as the general adjustments were sufficiently accurate over a short period of time to equalize the differences in proportion between the assessments of a class of property holders. (488 U.S. at p. 343 [102 L.Ed.2d at p. 697].) "[T]he constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners. [Citations.]" (488 U.S. at p. 344 [102 L.Ed.2d at p. 697], italics

added.) Webster County's adjustments to the assessments of property not recently sold were too small *"to seasonably dissipate the remaining disparity between these assessments and the assessments based on a recent purchase price."* (*Ibid.,* italics added.)

Further, it is established that " '[*i*]*ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.*' [Citations.] 'The equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class.' [Citation.]" (*Allegheny, supra,* 488 U.S. at p. 345 [102 L.Ed.2d at p. 698], italics added.)

*Allegheny* found the relative undervaluation of comparable property within Webster County was systematic and intentional. The assessor's arbitrary practice, which based petitioners' assessments upon the full market value of their property, while assessing comparable property pursuant to outdated values, had denied petitioners equal protection under West Virginia law. (*Allegheny, supra,* 488 U.S. at pp. 345-346 [102 L.Ed.2d at pp. 698-699].)

In a footnote toward the end of the opinion, *Allegheny* briefly acknowledges California's article XIII A *without* addressing its constitutionality. The footnote states: "We need not and do not decide today whether the Webster County assessment method would stand on a different footing if it were the law of a State, generally applied, instead of the aberrational enforcement policy it appears to be. The State of California has adopted a similar policy as Article XIIIA of its Constitution, popularly known as 'Proposition 13.' Proposition 13 generally provides that property will be assessed at its 1975-1976 value, and reassessed only when transferred, constructed upon, or, in a limited manner for inflation. Cal Const, Art XIIIA, § 2 (limiting inflation adjustments to 2% per year.) The system is grounded upon the belief that taxes should be based on the original cost of property and should not tax unrealized paper gains in the value of the property." (*Allegheny, supra,* 488 U.S. at pp. 344-345, fn. 4 [102 L.Ed.2d at p. 698].)

5. *Allegheny decision inapposite.*

■ *Allegheny* plainly is unavailing to Nordlinger because by adopting article XIII A, California has opted for an assessment method based on each individual owner's *acquisition* cost.

In marked contrast, the West Virginia Constitution requires property to be taxed at a uniform rate statewide according to its estimated *current*

*market value. (Allegheny, supra,* 488 U.S. at p. 345 [102 L.Ed.2d at p. 698].) *Allegheny's* holding must be viewed in that context. Thus, *Allegheny* does not stand for the general proposition that a welcome stranger approach which bases assessed value on acquisition cost violates equal protection. Nor does *Allegheny* hold that large disparities in the assessments of properties with similar current market values are unconstitutional per se.

Rather, *Allegheny* reiterates the principle that intentional undervaluation by state officials of other property in the *same class* contravenes the equal protection clause. (*Allegheny, supra,* 488 U.S. at p. 344 [102 L.Ed.2d at p. 698].)[7] If state law mandates a current market value assessment method, the state may not discriminate against new purchasers by only reassessing recently acquired property. To satisfy the equal protection clause, a state which has chosen a market value approach must "seasonably dissipate" disparities between the assessments of property not recently sold and assessments based on a recent purchase price. (*Allegheny, supra,* 488 U.S. at p. 344 [102 L.Ed.2d at p. 697].)

Because California law provides for an acquisition value assessment method, Nordlinger's reliance on *Allegheny's* striking down of an arbitrarily enforced current value method is misplaced. Further, nothing in *Allegheny* calls into question *Amador's* rejection of the right to travel challenge. Accordingly, we remain bound by *Amador* on both of these constitutional questions.

a. *Article XIII A comports with settled equal protection principles as reiterated in Allegheny.*

 *Allegheny* reiterates the prohibition on discrimination against property owners who are similarly situated within the *same class.* Article XIII A

---

[7] See for example, *Sunday Lake Iron Co.* v. *Wakefield* (1918) 247 U.S. 350 [62 L.Ed. 1154, 38 S.Ct. 495], cited by *Allegheny, supra,* 488 U.S. at pages 344-346 [102 L.Ed.2d at pages 697, 698]. In *Sunday Lake,* an inexperienced local assessor adopted the $65,000 valuation which his predecessor had placed upon the taxpayer's property. Subsequently, the Michigan Legislature passed an act to appraise all mining properties, and plaintiff's property was reassessed to $1,071,000. Because of an alleged lack of time and inadequate information, the state board of tax assessors declined to order a new and general survey of values or generally to increase other assessments, although plaintiff contended other properties were being assessed at no more than one-third of their market value. The following year, a diligent and successful effort was made to rectify any inequality. (*Sunday Lake Iron Co., supra,* 247 U.S. at pp. 352-353 [62 L.Ed. at pp. 1155-1156].)

*Sunday Lake* declared intentional systematic undervaluation by state officials of other property "in the same class" contravenes the constitutional right of those taxed upon the full value of their property. However, it found no denial of equal protection because the assessor did not intentionally violate the essential principle of practical uniformity. (*Sunday Lake Iron Co., supra,* 247 U.S. at pp. 352-353 [62 L.Ed. at pp. 1155-1156].)

complies with that principle. California does not discriminate against similarly situated property owners because each owner's assessment is based on acquisition cost.

██ Further, *Allegheny* recognizes "[t]he States, . . . have broad powers to impose and collect taxes. A State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable. *Allied Stores [of Ohio* v. *Bowers* (1959) 358 U.S. 522] 526-527, . . ." (*Allegheny, supra,* 488 U.S. at p. 344 [102 L.Ed.2d at p. 697].)[8] A state may decide to tax property held by corporations at a different rate than property held by individuals. (*Allegheny, supra,* 488 U.S. at p. 344 [102 L.Ed.2d at p. 697].) "In each case, '[i]f the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' [Citation.]" (*Id.,* at p. 344 [102 L.Ed.2d at pp. 697-698].)

██ Moreover, the states are not confined to a current value system under equal protection principles, and West Virginia was not precluded from adopting an assessment scheme based on a standard other than market value. (*Allegheny, supra,* 488 U.S. at p. 344 [102 L.Ed.2d at p. 698].)

Thus, it cannot be said an acquisition value assessment method contravenes equal protection under the law. Today, as when it was adopted, Proposition 13 can be upheld "on the belief that taxes should be based on the original cost of property and should not tax unrealized paper gains in the value of the property." (*Allegheny, supra,* 488 U.S. at p. 345, fn. 4, [102 L.Ed.2d at p. 698].) That is the beginning and the end of the inquiry. Any further scrutiny would involve the court impermissibly in examining the desirability of Proposition 13. (See *Daniel* v. *Family Ins. Co.* (1949) 336 U.S. 220, 224 [93 L.Ed. 632, 636-637, 69 S.Ct. 550, 10 A.L.R.2d 945].)

---

[8]*Allied Stores* involved an equal protection challenge to an Ohio statute which exempted from ad valorem taxation merchandise belonging to a nonresident if held in a storage warehouse for storage only. (*Allied Stores of Ohio, supra,* 358 U.S. at pp. 522-523 [3 L.Ed.2d at pp. 482-483].) It illustrates the application of the deferential rational basis standard.

The United States Supreme Court noted: "[I]t has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. [Citations.]" (*Allied Stores, supra,* 358 U.S. at p. 528 [3 L.Ed.2d at p. 486].) The court then rejected the constitutional claim, holding "it is obvious that it may reasonably have been the purpose and policy of the State Legislature, in adopting the proviso, to encourage the construction or leasing and operation of warehouses in Ohio by nonresidents with the attendant benefits to the State's economy, . . ." (*Id.,* at pp. 528-529 [3 L.Ed.2d at p. 486].)

6. *Additional arguments based on post-Amador right to travel cases.*

█ In addition to *Allegheny*, Nordlinger relies on other United States Supreme Court decisions after *Amador* to overturn *Amador*'s disposition of the right to travel issue under a heightened scrutiny standard.[9]

In *Zobel* v. *Williams* (1982) 457 U.S. 55, 56 [72 L.Ed.2d 672, 675, 102 S.Ct. 2309], the high court invalidated an Alaska statute which distributed income from state natural resources to Alaska citizens based on the length of each citizen's residence. *Zobel* held Alaska's unequal distribution of benefits failed even minimal rational basis scrutiny under the equal protection clause because Alaska's objective of rewarding citizens for past contributions was not a legitimate state purpose. (*Id.*, at pp. 60-63 [72 L.Ed.2d at pp. 677-680].)

In *Hooper* v. *Bernalillo County Assessor* (1985) 472 U.S. 612, 614, 623 [86 L.Ed.2d 487, 496, 105 S.Ct. 2862], the court struck down on equal protection grounds a New Mexico statute granting a property tax exemption to those Vietnam veterans who resided in the state before a specified date. *Hooper* observed: "Stripped of its asserted justifications, the New Mexico statute suffers from the same constitutional flaw as the Alaska statute in *Zobel*. [Fn. omitted.] The New Mexico statute, by singling out previous residents for the tax exemption, rewards only those citizens for their 'past contributions' toward our Nation's military effort in Vietnam . . . . The State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence . . . . [¶] [T]he Constitution will not tolerate a state benefit program that 'creates fixed, permanent distinctions . . . between . . . classes of concededly bona fide residents, based on how long they have been in the State.' [Citation.] [Fn. omitted.]" (*Id.*, at pp. 622-623 [86 L.Ed.2d at p. 496].)

Similarly, in *Attorney General of N.Y.* v. *Soto-Lopez, supra*, 476 U.S. 898, the court held a New York preference in civil service employment favoring

---

[9] The United States Supreme Court has observed "right to travel analysis refers to little more than a particular application of equal protection analysis. Right to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents. [Citations.]" (*Zobel* v. *Williams, supra,* 457 U.S. at pp. 60-61, fn. 6 [72 L.Ed.2d at pp. 677-678].) However, "regardless of the label we place on our analysis—right to migrate or equal protection—once we find a burden on the right to migrate the standard of review is the same. Laws which burden that right must be necessary to further a compelling state interest. [Citation.]" (*Attorney General of N.Y.* v. *Soto-Lopez* (1986) 476 U.S. 898, 904-905, fn. 4 [90 L.Ed.2d 899, 906-907, 106 S.Ct. 2317].)

veterans who were residents when they entered military service violated the rights to travel and to equal protection of resident veterans who resided outside New York when they entered military service. (*Id.*, at pp. 899, 911 [90 L.Ed.2d at pp. 903, 910-911].) New York failed to demonstrate a compelling state interest for its classification because each of its asserted purposes could be achieved without penalizing veterans who did not meet the prior residence requirement. (*Id.*, at pp. 909-911 [90 L.Ed.2d at pp. 909-911].)

■■■ The above-cited cases constitute good law but Nordlinger's reliance thereon is misplaced. Her argument overlooks the crucial fact that article XIII A's acquisition value assessment scheme applies equally to *nonresident* owners. Unlike the New Mexico residency-based tax exemption which was invalidated in *Hooper*, article XIII A bases each property owner's assessment on acquisition value, irrespective of the owner's status as a California resident or the owner's length of residence in the state. While the acquisition value assessment method relatively benefits longtime residents, that result merely is incidental to an acquisition value approach. In sum, the right to migrate is not burdened here.

Therefore, we are unpersuaded by the contention that since *Amador*, a heightened scrutiny standard has replaced the rational basis test utilized in *Amador*. The rational basis test employed by *Amador* remains the appropriate level of scrutiny herein.

7. *Article XIII A amendments do not invalidate it.*

■■■ Lastly, the rational basis of the acquisition value system is not invalidated by the fact that in the years since *Amador*, article XIII A, section 2, has been amended to provide base-year values may be transferred to certain replacement properties, and that certain transfers of property are deemed not to be a change of ownership.[10] In the field of taxation, the states enjoy wide "latitude . . . in the classification of property . . . and the granting of partial or total exemptions upon grounds of policy." (*Royster Guano Co.* v. *Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 991, 40 S.Ct. 560]; see *U.S. Railroad Retirement Bd.* v. *Fritz* (1980) 449 U.S. 166, 174-176 [66 L.Ed.2d 368, 375-377, 101 S.Ct. 453].) While we do not have the occasion here to address the propriety of those various exceptions, the existence thereof does not deprive article XIII A, section 2, of its essential

---

[10] For example, the transfer of a principal residence from parents to children does not trigger a reassessment. (Art. XIII A, § 2, subd. (h).)

rational basis, namely, to protect owners of real property from being assessed on their unrealized gains. (*Amador, supra,* 22 Cal.3d at p. 235.)

## CONCLUSION

The expected disparities of article XIII A, which severed assessed value from current market value, have manifested themselves in the years since the *Amador* decision. Nonetheless, as *Amador* determined, the article passes muster under the rational basis standard because it protects taxpayers from being assessed on the appreciated but unrealized value of their real property.

*Allegheny* is inapposite because it involves the intentional undervaluation of comparable property under a current market value assessment method. Because *Allegheny* held West Virginia was free to adopt an assessment approach based on a standard other than current market value, California is not precluded from basing real property assessments on acquisition value.

Article XIII A does not burden the right to migrate because the acquisition value system is equally applicable to nonresidents and does not classify California residents according to the time they established residence. While longtime residents derive relatively greater benefits from the acquisition value system, that result merely is incidental to an acquisition value approach.

Because Nordlinger is not capable of amending her pleading to state a cause for action for declaratory relief or for refund of taxes paid, the trial court properly sustained the demurrer to both causes of action without leave to amend.

Proposition 13 was a product of the tax revolt movement that swept California in the late 1970's. Because article XIII A is not constitutionally infirm, homeowners such as Nordlinger who seek a fairer tax assessment scheme must look again to the political process, not to the courts.[11]

---

[11] It is questionable, however, whether a majority of the electorate ever will be sufficiently aggrieved to repeal article XIII A's acquisition value assessment method. Although most current homeowners acquired their properties after 1975, they too are relatively benefitted by the acquisition value approach because their assessments do not reflect the subsequent appreciation in the value of their properties. Further, as property prices continue to climb due to inflation, a new purchaser's acquisition value soon is exceeded by the property's current value, thus giving the new owner a stake in the acquisition value system.

## DISPOSITION

The order of dismissal is affirmed. Each party to bear respective costs on appeal.

Danielson, J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 28, 1991. Kennard, J., was of the opinion that the petition should be granted.