## NORDLINGER *v.* HAHN, IN HIS CAPACITY AS TAX ASSESSOR FOR LOS ANGELES COUNTY, ET AL.

No. 90–1912.   Argued February 25, 1992—Decided June 18, 1992

1

2

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined, and in which THOMAS, J., joined as to Part II–A. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 18. STEVENS, J., filed a dissenting opinion, *post*, p. 28.

*Carlyle W. Hall, Jr.*, argued the cause and filed briefs for petitioner.

*Rex E. Lee* argued the cause for respondents. With him on the brief were *Carter G. Phillips, Mark D. Hopson, DeWitt W. Clinton, David L. Muir*, and *Albert Ramseyer*.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In 1978, California voters staged what has been described as a property tax revolt[1] by approving a statewide ballot

---

*Briefs of *amici curiae* urging reversal were filed for the Building Industry Association of Southern California, Inc., et al. by *Brent N. Rushforth, Bruce J. Ennis, Jr.*, and *Anthony C. Epstein;* and for *William K. Rentz*, pro se.

Briefs of *amici curiae* urging affirmance were filed for the State of California by *Daniel E. Lungren*, Attorney General, and *Robert D. Milam*, Deputy Attorney General; for Pete Wilson, Governor of California, et al. by *L. Michael Bogert;* for the California Taxpayers' Association by *Robert Joe Hull* and *Douglas L. Kindrick;* for the Howard Jarvis Taxpayers Association et al. by *Ronald A. Zumbrun, John H. Findley, Anthony T. Caso*, and *Trevor A. Grimm;* for the People's Advocate, Inc., et al. by *Jayna P. Kapinski;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *John C. Scully*.

Briefs of *amici curiae* were filed for the Senate of the State of California by *Jeremiah F. Hallisey;* for the American Planning Association et al. by *William W. Abbott* and *Marilee Hanson;* for the California Assessors' Association by *Douglas J. Maloney* and *Allen A. Haim;* for the International Association of Assessing Officers by *James F. Gossett;* and for the League of Women Voters of California by *Steven C. McCracken* and *Robert E. Palmer*.

[1] See N. Y. Times, June 8, 1978, p. 23, col. 1; Washington Post, June 11, 1978, p. H1.

initiative known as Proposition 13. The adoption of Proposition 13 served to amend the California Constitution to impose strict limits on the rate at which real property is taxed and on the rate at which real property assessments are increased from year to year. In this litigation, we consider a challenge under the Equal Protection Clause of the Fourteenth Amendment to the manner in which real property now is assessed under the California Constitution.

## I

### A

Proposition 13 followed many years of rapidly rising real property taxes in California. From fiscal years 1967–1968 to 1971–1972, revenues from these taxes increased on an average of 11.5% per year. See Report of the Senate Commission on Property Tax Equity and Revenue to the California State Senate 23 (1991) (Senate Commission Report). In response, the California Legislature enacted several property tax relief measures, including a cap on tax rates in 1972. *Id.*, at 23–24. The boom in the State's real estate market persevered, however, and the median price of an existing home doubled from $31,530 in 1973 to $62,430 in 1977. As a result, tax levies continued to rise because of sharply increasing assessment values. *Id.*, at 23. Some homeowners saw their tax bills double or triple during this period, well outpacing any growth in their income and ability to pay. *Id.*, at 25. See also Oakland, Proposition 13—Genesis and Consequences, 32 Nat. Tax J. 387, 392 (Supp. June 1979).

By 1978, property tax relief had emerged as a major political issue in California. In only one month's time, tax relief advocates collected over 1.2 million signatures to qualify Proposition 13 for the June 1978 ballot. See Lefcoe & Allison, The Legal Aspects of Proposition 13: The *Amador Valley* Case, 53 S. Cal. L. Rev. 173, 174 (1978). On election day, Proposition 13 received a favorable vote of 64.8% and carried 55 of the State's 58 counties. California Secretary of State,

Statement of Vote and Supplement, Primary Election, June 6, 1978, p. 39. California thus had a novel constitutional amendment that led to a property tax cut of approximately $7 billion in the first year. Senate Commission Report 28. A California homeowner with a $50,000 home enjoyed an immediate reduction of about $750 per year in property taxes. *Id.*, at 26.

As enacted by Proposition 13, Article XIIIA of the California Constitution caps real property taxes at 1% of a property's "full cash value." § 1(a). "Full cash value" is defined as the assessed valuation as of the 1975–1976 tax year or, "thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment." § 2(a). The assessment "may reflect from year to year the inflationary rate not to exceed 2 percent for any given year." § 2(b).

Article XIIIA also contains several exemptions from this reassessment provision. One exemption authorizes the legislature to allow homeowners over the age of 55 who sell their principal residences to carry their previous base-year assessments with them to replacement residences of equal or lesser value. § 2(a). A second exemption applies to transfers of a principal residence (and up to $1 million of other real property) between parents and children. § 2(h).

In short, Article XIIIA combines a 1% ceiling on the property tax rate with a 2% cap on annual increases in assessed valuations. The assessment limitation, however, is subject to the exception that new construction or a change of ownership triggers a reassessment up to current appraised value. Thus, the assessment provisions of Article XIIIA essentially embody an "acquisition value" system of taxation rather than the more commonplace "current value" taxation. Real property is assessed at values related to the value of the property at the time it is acquired by the taxpayer rather than to the value it has in the current real estate market.

Over time, this acquisition-value system has created dramatic disparities in the taxes paid by persons owning similar pieces of property. Property values in California have inflated far in excess of the allowed 2% cap on increases in assessments for property that is not newly constructed or that has not changed hands. See Senate Commission Report 31–32. As a result, longer term property owners pay lower property taxes reflecting historic property values, while newer owners pay higher property taxes reflecting more recent values. For that reason, Proposition 13 has been labeled by some as a "welcome stranger" system—the newcomer to an established community is "welcome" in anticipation that he will contribute a larger percentage of support for local government than his settled neighbor who owns a comparable home. Indeed, in dollar terms, the differences in tax burdens are staggering. By 1989, the 44% of California homeowners who have owned their homes since enactment of Proposition 13 in 1978 shouldered only 25% of the more than $4 billion in residential property taxes paid by homeowners statewide. *Id.*, at 33. If property values continue to rise more than the annual 2% inflationary cap, this disparity will continue to grow.

B

According to her amended complaint, petitioner Stephanie Nordlinger in November 1988 purchased a house in the Baldwin Hills neighborhood of Los Angeles County for $170,000. App. 5. The prior owners bought the home just two years before for $121,500. *Id.*, at 6. Before her purchase, petitioner had lived in a rented apartment in Los Angeles and had not owned any real property in California. *Id.*, at 5; Tr. of Oral Arg. 12.

In early 1989, petitioner received a notice from the Los Angeles County Tax Assessor, who is a respondent here, informing her that her home had been reassessed upward to $170,100 on account of its change in ownership. App. 7.

She learned that the reassessment resulted in a property tax increase of $453.60, up 36% to $1,701, for the 1988–1989 fiscal year. *Ibid.*

Petitioner later discovered she was paying about five times more in taxes than some of her neighbors who owned comparable homes since 1975 within the same residential development. For example, one block away, a house of identical size on a lot slightly larger than petitioner's was subject to a general tax levy of only $358.20 (based on an assessed valuation of $35,820, which reflected the home's value in 1975 plus the up-to-2% per year inflation factor). *Id.*, at 9–10.[2] According to petitioner, her total property taxes over the first 10 years in her home will approach $19,000, while any neighbor who bought a comparable home in 1975 stands to pay just $4,100. Brief for Petitioner 3. The general tax levied against her modest home is only a few dollars short of that paid by a pre-1976 owner of a $2.1 million Malibu beachfront home. App. 24.

After exhausting administrative remedies, petitioner brought suit against respondents in Los Angeles County Superior Court. She sought a tax refund and a declaration that her tax was unconstitutional.[3] In her amended com-

---

[2] Petitioner proffered to the trial court additional evidence suggesting that the disparities in residential tax burdens were greater in other Los Angeles County neighborhoods. For example, a small two-bedroom house in Santa Monica that was previously assessed at $27,000 and that was sold for $465,000 in 1989 would be subject to a tax levy of $4,650, a bill 17 times more than the $270 paid the year before by the previous owner. App. 76–77. Petitioner also proffered evidence suggesting that similar disparities obtained with respect to apartment buildings and commercial and industrial income-producing properties. *Id.*, at 68–69, 82–85.

[3] California by statute grants a cause of action to a taxpayer "where the alleged illegal or unconstitutional assessment or collection occurs as the direct result of a change in administrative regulations or statutory or constitutional law that became effective not more than 12 months prior to the date the action is initiated by the taxpayer." Cal. Rev. & Tax. Code Ann. §4808 (West 1987). Although Proposition 13 was enacted 11 years before she filed her complaint, petitioner contended that the relevant change in

plaint, she alleged: "Article XIIIA has created an arbitrary system which assigns disparate real property tax burdens on owners of generally comparable and similarly situated properties without regard to the use of the real property taxed, the burden the property places on government, the actual value of the property or the financial capability of the property owner." *Id.*, at 12. Respondents demurred. *Id.*, at 14. By minute order, the Superior Court sustained the demurrer and dismissed the complaint without leave to amend. App. to Pet. for Cert. D2.

The California Court of Appeal affirmed. *Nordlinger* v. *Lynch*, 225 Cal. App. 3d 1259, 275 Cal. Rptr. 684 (1990). It noted that the Supreme Court of California already had rejected a constitutional challenge to the disparities in taxation resulting from Article XIIIA. See *Amador Valley Joint Union High School Dist.* v. *State Bd. of Equalization*, 22 Cal. 3d 208, 583 P. 2d 1281 (1978). Characterizing Article XIIIA as an "acquisition value" system, the Court of Appeal found it survived equal protection review, because it was supported by at least two rational bases: First, it prevented property taxes from reflecting unduly inflated and unforeseen current values, and, second, it allowed property owners to estimate future liability with substantial certainty. 225 Cal. App. 3d, at 1273, 275 Cal. Rptr., at 691–692 (citing *Amador*, 22 Cal. 3d, at 235, 583 P. 2d, at 1293).

The Court of Appeal also concluded that this Court's more recent decision in *Allegheny Pittsburgh Coal Co.* v. *County Comm'n of Webster Cty.*, 488 U. S. 336 (1989), did not warrant a different result. At issue in *Allegheny Pittsburgh* was the practice of a West Virginia county tax assessor of assessing recently purchased property on the basis of its pur-

___

law was this Court's decision in *Allegheny Pittsburgh Coal Co.* v. *County Comm'n of Webster Cty.*, 488 U. S. 336 (1989), decided 9 months before petitioner filed her amended complaint. Because the California courts did not discuss whether petitioner's action was timely under § 4808, we do not do so.

chase price, while making only minor modifications in the assessments of property that had not recently been sold. Properties that had been sold recently were reassessed and taxed at values between 8 and 35 times that of properties that had not been sold. *Id.*, at 341. This Court determined that the unequal assessment practice violated the Equal Protection Clause.

The Court of Appeal distinguished *Allegheny Pittsburgh* on the grounds that "California has opted for an assessment method based on each individual owner's *acquisition* cost," while, "[i]n marked contrast, the West Virginia Constitution requires property to be taxed at a uniform rate statewide according to its estimated *current* market value" (emphasis in original). 225 Cal. App. 3d, at 1277–1278, 275 Cal. Rptr., at 695. Thus, the Court of Appeal found: "*Allegheny* does not prohibit the states from adopting an acquisition value assessment method. That decision merely prohibits the arbitrary enforcement of a current value assessment method" (emphasis omitted). *Id.*, at 1265, 275 Cal. Rptr., at 686.

The Court of Appeal also rejected petitioner's argument that the effect of Article XIIIA on the constitutional right to travel warranted heightened equal protection review. The court determined that the right to travel was not infringed, because Article XIIIA "bases each property owner's assessment on acquisition value, irrespective of the owner's status as a California resident or the owner's length of residence in the state." *Id.*, at 1281, 275 Cal. Rptr., at 697. Any benefit to longtime California residents was deemed "incidental" to an acquisition-value approach. Finally, the Court of Appeal found its conclusion was unchanged by the exemptions in Article XIIIA. *Ibid.*

The Supreme Court of California denied review. App. to Pet. for Cert. B1. We granted certiorari. 502 U. S. 807 (1991).

## II

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920).

As a general rule, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan* v. *Maryland,* 366 U. S. 420, 425–426 (1961). Accordingly, this Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest. See, *e. g., Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 439–441 (1985); *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976).

## A

At the outset, petitioner suggests that Article XIIIA qualifies for heightened scrutiny because it infringes upon the constitutional right to travel. See, *e. g., Zobel* v. *Williams,* 457 U. S. 55, 60, n. 6 (1982); *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 254–256 (1974). In particular, petitioner alleges that the exemptions to reassessment for transfers by owners over the age of 55 and for transfers between parents and children run afoul of the right to travel, because they classify directly on the basis of California residency. But the complaint does not allege that petitioner herself has been impeded from traveling or from settling in California because, as has been noted, prior to purchasing her home,

petitioner lived in an apartment in Los Angeles. This Court's prudential standing principles impose a "general prohibition on a litigant's raising another person's legal rights." *Allen* v. *Wright*, 468 U. S. 737, 751 (1984). See also *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 166 (1972). Petitioner has not identified any obstacle preventing others who wish to travel or settle in California from asserting claims on their own behalf, nor has she shown any special relationship with those whose rights she seeks to assert, such that we might overlook this prudential limitation. *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 623, n. 3 (1989). Accordingly, petitioner may not assert the constitutional right to travel as a basis for heightened review.

## B

The appropriate standard of review is whether the difference in treatment between newer and older owners rationally furthers a legitimate state interest. In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, see *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 174, 179 (1980), the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, see *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 464 (1981), and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational, see *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S., at 446. This standard is especially deferential in the context of classifications made by complex tax laws. "[I]n structuring internal taxation schemes 'the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.'" *Williams* v. *Vermont*, 472 U. S. 14, 22 (1985), quoting *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 359 (1973). See also *Regan* v. *Taxation with Representation of Wash.*, 461

U. S. 540, 547 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes").

As between newer and older owners, Article XIIIA does not discriminate with respect to either the tax rate or the annual rate of adjustment in assessments. Newer and older owners alike benefit in both the short and long run from the protections of a 1% tax rate ceiling and no more than a 2% increase in assessment value per year. New owners and old owners are treated differently with respect to one factor only—the basis on which their property is initially assessed. Petitioner's true complaint is that the State has denied her—a new owner—the benefit of the same assessment value that her neighbors—older owners—enjoy.

We have no difficulty in ascertaining at least two rational or reasonable considerations of difference or policy that justify denying petitioner the benefits of her neighbors' lower assessments. First, the State has a legitimate interest in local neighborhood preservation, continuity, and stability. *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926). The State therefore legitimately can decide to structure its tax system to discourage rapid turnover in ownership of homes and businesses, for example, in order to inhibit displacement of lower income families by the forces of gentrification or of established, "mom-and-pop" businesses by newer chain operations. By permitting older owners to pay progressively less in taxes than new owners of comparable property, the Article XIIIA assessment scheme rationally furthers this interest.

Second, the State legitimately can conclude that a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher taxes as does an existing owner. The State may deny a new owner at the point of purchase the right to "lock in" to the same assessed value as is enjoyed by an existing owner of comparable property, because an existing owner rationally

may be thought to have vested expectations in his property or home that are more deserving of protection than the anticipatory expectations of a new owner at the point of purchase. A new owner has full information about the scope of future tax liability before acquiring the property, and if he thinks the future tax burden is too demanding, he can decide not to complete the purchase at all. By contrast, the existing owner, already saddled with his purchase, does not have the option of deciding not to buy his home if taxes become prohibitively high. To meet his tax obligations, he might be forced to sell his home or to divert his income away from the purchase of food, clothing, and other necessities. In short, the State may decide that it is worse to have owned and lost, than never to have owned at all.

This Court previously has acknowledged that classifications serving to protect legitimate expectation and reliance interests do not deny equal protection of the laws.[4] "The protection of reasonable reliance interests is not only a legitimate governmental objective: it provides an exceedingly persuasive justification . . . ." *Heckler* v. *Mathews*, 465 U. S. 728, 746 (1984) (internal quotation marks omitted). For example, in *Kadrmas* v. *Dickinson Public Schools*, 487 U. S. 450 (1988), the Court determined that a prohibition on user fees for bus service in "reorganized" school districts, but not

---

[4] Outside the context of the Equal Protection Clause, the Court has not hesitated to recognize the legitimacy of protecting reliance and expectational interests. See, *e. g.*, *Rakas* v. *Illinois*, 439 U. S. 128, 143 (1978) ("[P]rotection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 124 (1978) (whether regulation of property constitutes a "taking" depends in part on "the extent to which the regulation has interfered with distinct investment-backed expectations"); *Perry* v. *Sindermann*, 408 U. S. 593, 601 (1972) (state-law "property" interest for purpose of federal due process denotes "interests that are secured by existing rules or understandings") (internal quotation marks omitted).

in "nonreorganized" school districts, does not violate the Equal Protection Clause, because "the legislature could conceivably have believed that such a policy would serve the legitimate purpose of fulfilling the reasonable expectations of those residing in districts with free busing arrangements imposed by reorganization plans." *Id.*, at 465. Similarly, in *United States Railroad Retirement Bd.* v. *Fritz*, the Court determined that a denial of dual "windfall" retirement benefits to some railroad workers, but not others, did not violate the Equal Protection Clause, because "Congress could properly conclude that persons who had actually acquired statutory entitlement to windfall benefits while still employed in the railroad industry had a greater equitable claim to those benefits than the members of appellee's class who were no longer in railroad employment when they became eligible for dual benefits." 449 U. S., at 178. Finally, in *New Orleans* v. *Dukes*, 427 U. S. 297 (1976), the Court determined that an ordinance banning certain street-vendor operations, but grandfathering existing vendors who had been in operation for more than eight years, did not violate the Equal Protection Clause because the "city could reasonably decide that newer businesses were less likely to have built up substantial reliance interests in continued operation." *Id.*, at 305.[5]

Petitioner argues that Article XIIIA cannot be distinguished from the tax assessment practice found to violate the Equal Protection Clause in *Allegheny Pittsburgh*. Like Article XIIIA, the practice at issue in *Allegheny Pittsburgh* resulted in dramatic disparities in taxation of properties of comparable value. But an obvious and critical factual differ-

---

[5] Because we conclude that Article XIIIA rationally furthers the State's interests in neighborhood stability and the protection of property owners' reliance interests, we need not consider whether it permissibly serves other interests discussed by the parties, including whether it taxes real property according to the taxpayers' ability to pay or whether it taxes real property in such a way as to promote stability of local tax revenues.

ence between this case and *Allegheny Pittsburgh* is the absence of any indication in *Allegheny Pittsburgh* that the policies underlying an acquisition-value taxation scheme could conceivably have been the purpose for the Webster County tax assessor's unequal assessment scheme. In the first place, Webster County argued that "its assessment scheme is rationally related to its purpose of assessing properties *at true current value*" (emphasis added). 488 U. S., at 343.[6] Moreover, the West Virginia "Constitution and laws provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value," and the Court found "no suggestion" that "the State may have adopted a different system in practice from that specified by statute." *Id.*, at 345.

To be sure, the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S., at 179. See also *McDonald* v. *Board of Election Comm'rs of Chicago*, 394 U. S. 802, 809 (1969) (legitimate state purpose may be ascertained even when the legislative or administrative history is silent). Nevertheless, this Court's review does require that a purpose may conceivably or "may reasonably have been the purpose and policy" of the relevant governmental decisionmaker. *Allied Stores of Ohio, Inc.* v. *Bow-*

---

[6] Webster County argued that the outdated assessments it used were consistent with current-value taxation, because periodic upward adjustments were made for inflation and it was not feasible to reassess individually each piece of property every year. Although the county obliquely referred in a footnote to the advantages of historical cost accounting, Brief for Respondent in *Allegheny Pittsburgh Coal Co.* v. *County Comm'n of Webster Cty.*, O. T. 1988, No. 87–1303, p. 30, n. 23, this was not an assertion of the general policies supporting acquisition-value taxation. Even if acquisition-value policies had been asserted, the assertion would have been nonsensical given its inherent inconsistency with the county's principal argument that it was in fact trying to promote current-value taxation.

*ers,* 358 U. S. 522, 528–529 (1959). See also *Schweiker* v. *Wilson,* 450 U. S. 221, 235 (1981) (classificatory scheme must "rationally advanc[e] a reasonable and *identifiable* governmental objective" (emphasis added)). *Allegheny Pittsburgh* was the rare case where the facts precluded any plausible inference that the reason for the unequal assessment practice was to achieve the benefits of an acquisition-value tax scheme.[7] By contrast, Article XIIIA was enacted precisely to achieve the benefits of an acquisition-value system. *Allegheny Pittsburgh* is not controlling here.[8]

Finally, petitioner contends that the unfairness of Article XIIIA is made worse by its exemptions from reassessment for two special classes of new owners: persons aged 55 and older, who exchange principal residences, and children who acquire property from their parents. This Court previously has declined to hold that narrow exemptions from a general scheme of taxation necessarily render the overall scheme in-

---

[7] In *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522 (1959), the Court distinguished on similar grounds its decision in *Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562 (1949), which invalidated a state statutory scheme exempting from taxation certain notes and accounts receivable owned by residents of the State but not notes and accounts receivable owned by nonresidents. 358 U. S., at 529. After the Court in *Wheeling Steel* determined that the statutory scheme's stated purpose was not legitimate, the other purposes did not need to be considered because "[h]aving themselves specifically declared their purpose, the Ohio statutes left no room to conceive of any other purpose for their existence." 358 U. S., at 530.

[8] In finding *Allegheny Pittsburgh* distinguishable, we do not suggest that the protections of the Equal Protection Clause are any less when the classification is drawn by legislative mandate, as in this case, than by administrative action, as in *Allegheny Pittsburgh.* See *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350, 352 (1918). Nor do we suggest that the Equal Protection Clause constrains administrators, as in *Allegheny Pittsburgh,* from violating state law requiring uniformity of taxation of property. See *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 368–370 (1940); *Puget Sound Power & Light Co.* v. *County of King,* 264 U. S. 22, 27–28 (1924). See generally *Snowden* v. *Hughes,* 321 U. S. 1, 8–11 (1944).

vidiously discriminatory. See, e. g., *Regan* v. *Taxation with Representation of Wash.*, 461 U. S., at 550–551 (denial of tax exemption to nonprofit lobbying organizations, but with an exception for veterans' groups, does not violate equal protection). For purposes of rational-basis review, the "latitude of discretion is notably wide in . . . the granting of partial or total exemptions upon grounds of policy." *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S., at 415.

The two exemptions at issue here rationally further legitimate purposes. The people of California reasonably could have concluded that older persons in general should not be discouraged from moving to a residence more suitable to their changing family size or income. Similarly, the people of California reasonably could have concluded that the interests of family and neighborhood continuity and stability are furthered by and warrant an exemption for transfers between parents and children. Petitioner has not demonstrated that no rational bases lie for either of these exemptions.

## III

Petitioner and *amici* argue with some appeal that Article XIIIA frustrates the "American dream" of home ownership for many younger and poorer California families. They argue that Article XIIIA places startup businesses that depend on ownership of property at a severe disadvantage in competing with established businesses. They argue that Article XIIIA dampens demand for and construction of new housing and buildings. And they argue that Article XIIIA constricts local tax revenues at the expense of public education and vital services.

Time and again, however, this Court has made clear in the rational-basis context that the "Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has

acted" (footnote omitted). *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979). Certainly, California's grand experiment appears to vest benefits in a broad, powerful, and entrenched segment of society, and, as the Court of Appeal surmised, ordinary democratic processes may be unlikely to prompt its reconsideration or repeal. See 225 Cal. App. 3d, at 1282, n. 11, 275 Cal. Rptr., at 698, n. 11. Yet many wise and well-intentioned laws suffer from the same malady. Article XIIIA is not palpably arbitrary, and we must decline petitioner's request to upset the will of the people of California.

The judgment of the Court of Appeal is affirmed.

*It is so ordered.*

JUSTICE THOMAS, concurring in part and concurring in the judgment.

In *Allegheny Pittsburgh Coal Co.* v. *County Comm'n of Webster Cty.,* 488 U. S. 336 (1989), this Court struck down an assessment method used in Webster County, West Virginia, that operated precisely the same way as the California scheme being challenged today. I agree with the Court that Proposition 13 is constitutional. But I also agree with JUSTICE STEVENS that *Allegheny Pittsburgh* cannot be distinguished. See *post,* at 31–32. To me *Allegheny Pittsburgh* represents a "needlessly intrusive judicial infringement on the State's legislative powers," *New Orleans* v. *Dukes,* 427 U. S. 297, 306 (1976) *(per curiam),* and I write separately because I see no benefit, and much risk, in refusing to confront it directly.

## I

*Allegheny Pittsburgh* involved a county assessment scheme indistinguishable in relevant respects from Proposition 13. As the Court explains, California taxes real property at 1% of "full cash value," which means the "assessed value" as of 1975 (under the previous method) and after 1975–1976 the "appraised value of real property when pur-

chased, newly constructed, or a change in value has occurred after the 1975 assessment." The assessed value may be increased for inflation, but only at a maximum rate of 2% each year. See California Const., Art. XIIIA, §§ 1(a), 2(a); *ante*, at 5. The property tax system worked much the same way in Webster County, West Virginia. The tax assessor assigned real property an "appraised value," set the "assessed value" at half of the appraised value, then collected taxes by multiplying the assessed value by the relevant tax rate. For property that had been sold recently, the assessor set the appraised value at the most recent price of purchase. For property that had not been sold recently, she increased the appraised price by 10%, first in 1976, then again in 1981 and 1983.

The assessor's methods resulted in "dramatic differences in valuation between . . . recently transferred property and otherwise comparable surrounding land." 488 U. S., at 341; cf. Glennon, Taxation and Equal Protection, 58 Geo. Wash. L. Rev. 261, 269–270 (1990) (discussing the effects of Proposition 13); Cohen, State Law in Equality Clothing: A Comment on *Allegheny Pittsburgh Coal Company* v. *County Commission,* 38 UCLA L. Rev. 87, 91, and n. 29 (1990); Hellerstein & Peters, Recent Supreme Court Decisions Have Far-Reaching Implications, 70 J. Taxation 306, 308–310 (1989). Several coal companies that owned property in Webster County sued the county assessor, alleging violations of both the West Virginia and the United States Constitutions. The Supreme Court of Appeals of West Virginia upheld the assessment against the companies, but this Court reversed.

The *Allegheny Pittsburgh* Court asserted that with respect to taxation, the Equal Protection Clause constrains the States as follows. Although "[t]he use of a general adjustment as a transitional substitute for an individual reappraisal violates no constitutional command," the Clause requires that "general adjustments [be] accurate enough over a short period of time to equalize the differences in proportion be-

tween the assessments of a class of property holders." 488 U. S., at 343. "[T]he constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." *Ibid.* (citing *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522, 526–527 (1959)). Moreover, the Court stated, the Constitution and laws of West Virginia "provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value," and "[t]here [was] no suggestion . . . that the State may have adopted a different system in practice from that specified by statute." 488 U. S., at 345. "Indeed, [the assessor's] practice seems contrary to that of the guide published by the West Virginia Tax Commission as an aid to local assessors in the assessment of real property." *Ibid.;* see also *ibid.* ("We are not advised of any West Virginia statute or practice which authorizes individual counties of the State to fashion their own substantive assessment policies independently of state statute"). The Court refused to decide "whether the Webster County assessment method would stand on a different footing if it were the law of a State, generally applied, instead of the aberrational enforcement policy it appears to be." *Id.,* at 344, n. 4. Finally, the Court declared: " '[I]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.' " *Id.,* at 345 (quoting *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350, 352–353 (1918), and citing *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441 (1923); *Cumberland Coal Co.* v. *Board of Revision of Tax Assessments in Greene County,* 284 U. S. 23 (1931)). The Court concluded that the assessments for the coal companies' properties had failed these requisites of the Equal Protection Clause.

## II

As the Court accurately states today, "this Court's cases"—*Allegheny Pittsburgh* aside—"are clear that, unless a classification warrants some form of heightened review because it jeopardizes [the] exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Ante,* at 10; see also *Burlington Northern R. Co.* v. *Ford,* 504 U. S. 648, 651 (1992); *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356, 359 (1973). The California tax system, like most, does not involve either suspect classes or fundamental rights, and the Court properly reviews California's classification for a rational basis. Today's review, however, differs from the review in *Allegheny Pittsburgh.*

The Court's analysis in *Allegheny Pittsburgh* is susceptible, I think, to at least three interpretations. The first is the one offered by petitioner. Under her reading of the case, properties are "similarly situated" or within the same "class" for the purposes of the Equal Protection Clause when they are located in roughly the same types of neighborhoods, for example, are roughly the same size, and are roughly the same in other, unspecified ways. According to petitioner, the Webster County assessor's plan violated the Equal Protection Clause because she had failed to achieve a "seasonable attainment of a rough equality in tax treatment" of all the objectively comparable properties in Webster County, presumably those with about the same acreage and about the same amount of coal. Petitioner contends that Proposition 13 suffers from similar flaws. In 1989, she points out, "the long-time owner of a stately 7,800-square-foot, sevenbedroom mansion on a huge lot in Beverly Hills (among the most luxurious homes in one of the most expensive neighborhoods in Los Angeles County) . . . paid *less* property tax annually than the new homeowner of a tiny 980-square-foot home on a small lot in an extremely modest Venice neighbor-

hood." Brief for Petitioner 5; see also *id.*, at 7 (Petitioner's "1988 property tax assessment on her unpretentious Baldwin Hills tract home is almost identical to that of a pre-1976 owner of a fabulous beach-front Malibu residential property worth $2.1 million, even though her property is worth only 1/12th as much as his"). Because California not only has not tried to repair this systematic, intentional, and gross disparity in taxation, but has enacted it into positive law, petitioner argues, Proposition 13 violates the Equal Protection Clause.

This argument rests, in my view, on a basic misunderstanding of *Allegheny Pittsburgh.* The Court there proceeded on the assumption of law (assumed because the parties did not contest it) that the initial classification, by the State, was constitutional, and the assumption of fact (assumed because the parties had so stipulated) that the properties were comparable under the State's classification. But cf. Glennon, 58 Geo. Wash. L. Rev., at 271–272 (noting that some of the properties contained coal and others did not). In referring to the tax treatment of a "class of property holders," or "similarly situated property owners," 488 U. S., at 343, the Court did not purport to review the constitutionality of the initial classification, by market value, drawn by the State, as opposed to the further subclassification within the initial class, by acquisition value, drawn by the assessor. Instead, *Allegheny Pittsburgh* assumed that whether properties or persons are similarly situated depended on state law, and not, as petitioner argues, on some neutral criteria such as size or location that serve as proxies for market value. Under that theory, market value would be the *only* rational basis for classifying property. But the Equal Protection Clause does not prescribe a single method of taxation. We have consistently rejected petitioner's theory, see, *e. g., Ohio Oil Co.* v. *Conway,* 281 U. S. 146 (1930); *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232 (1890), and the Court properly rejects it today.

*Allegheny Pittsburgh,* then, does not prevent the State of California from classifying properties on the basis of their value at acquisition, so long as the classification is supported by a rational basis. I agree with the Court that it is, both for the reasons given by this Court, see *ante,* at 11–14, and for the reasons given by the Supreme Court of California in *Amador Valley Joint Union High School Dist.* v. *State Bd. of Equalization,* 22 Cal. 3d 208, 583 P. 2d 1281 (1978). But the classification employed by the Webster County assessor, indistinguishable from California's, was rational for all those reasons as well. In answering petitioner's argument that *Allegheny Pittsburgh* controls here, respondents offer a second explanation for that case. JUSTICE STEVENS gives much the same explanation, see *post,* at 31–32, though he concludes in the end that Proposition 13, after *Allegheny Pittsburgh,* is unconstitutional.

According to respondents, the Equal Protection Clause permits a State itself to determine which properties are similarly situated, as the State of California did here (classifying properties by acquisition value) and as the State of West Virginia did in *Allegheny Pittsburgh* (classifying properties by market value). But once a State does so, respondents suggest, the Equal Protection Clause requires after *Allegheny Pittsburgh* that properties in the same class be accorded seasonably equal treatment and not be intentionally and systematically undervalued. Proposition 13 provides for the assessment of properties in the same state-determined class regularly and at roughly full value; this contrasts with the tax scheme in Webster County, where by dividing property in the same class (by market value) into a subclass (by acquisition value), the assessor regularly undervalued the property similarly situated. This, according to respondents, made the Webster County scheme unconstitutional, and distinguishes Proposition 13.

Respondents' reading of *Allegheny Pittsburgh* is, in my view, as misplaced as petitioner's; their test, for starters,

comes with a dubious pedigree. In one of the cases cited in *Allegheny Pittsburgh, Allied Stores,* we upheld against an equal protection challenge a statute that exempted some corporations from ad valorem taxes imposed on others. Not only does *Allied Stores* not even hint that the Constitution "require[s] . . . the seasonable attainment of a rough equality in tax treatment of similarly situated property owners," 488 U. S., at 343, we took pains there to stress a very different proposition:

> "The States have very wide discretion in the laying of their taxes. . . . Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State . . . is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." *Allied Stores,* 358 U. S., at 526–527.

Two of the other cases cited in *Allegheny Pittsburgh, Sunday Lake Iron* and *Sioux City Bridge,* also rejected equal protection challenges, see also *Charleston Fed. Sav. & Loan Assn.* v. *Alderson,* 324 U. S. 182 (1945), and the case in which the words intentional, systematic, and undervaluation first appeared, *Coulter* v. *Louisville & Nashville R. Co.,* 196 U. S. 599, 609 (1905), did not explain where the test came from or why.

It is true that we applied the rule of *Coulter* to strike down a tax system in *Cumberland Coal,* also cited in *Allegheny Pittsburgh. Cumberland Coal,* however, reflects the most serious of the problems with respondents' reading of *Allegheny Pittsburgh.* As respondents understand these two cases, their rule is categorical: A tax scheme violates the Equal Protection Clause unless it provides for "the sea-

sonable attainment of a rough equality in tax treatment" or if it results in "'intentional systematic undervaluation'" of properties similarly situated by state law. 488 U. S., at 343, 345. This would be so regardless of whether the inequality or the undervaluation, which may result (as in Webster County) from further classifications of properties within a class, is supported by a rational basis. But not since the coming of modern equal protection jurisprudence has this Court supplanted the rational judgments of state representatives with its own notions of "rough equality," "undervaluation," or "fairness." *Cumberland Coal*, which fails even to mention rational-basis review, conflicts with our current case law. *Allegheny Pittsburgh* did not, in my view, mean to return us to the era when this Court sometimes second-guessed state tax officials. In rejecting today respondents' reading of *Allegheny Pittsburgh*, the Court, as I understand it, agrees.

This brings me to the third explanation for *Allegheny Pittsburgh*, the one offered today by the Court. The Court proceeds in what purports to be our standard equal protection framework, though it reapplies an old, and to my mind discredited, gloss to rational-basis review. The Court concedes that the "Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Ante*, at 15 (citing *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 179 (1980)). This principle applies, the Court acknowledges, not only to an initial classification but to all further classifications within a class. "Nevertheless, this Court's review does require that a purpose may conceivably or 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker," the Court says, *ante*, at 15 (quoting *Allied Stores, supra,* at 528–529), and "*Allegheny Pittsburgh* was the rare case where the facts precluded any plausible inference that the reason for the un-

equal assessment practice was to achieve the benefits of an acquisition-value tax scheme," *ante*, at 16. Rather than obeying the "law of a State, generally applied," the county assessor had administered an "aberrational enforcement policy." 488 U. S., at 344, n. 4. See *ante*, at 15. According to the Court, therefore, the problem in *Allegheny Pittsburgh* was that the Webster County scheme, though otherwise rational, was irrational because it was contrary to state law. Any rational bases underlying the acquisition-value scheme were "implausible" (or "unreasonable") because they were made so by the Constitution and laws of the State of West Virginia.

That explanation, like petitioner's and respondents', is in tension with settled case law. Even if the assessor did violate West Virginia law (and that she did is open to question, see *In re 1975 Tax Assessments Against Oneida Coal Co.*, 178 W. Va. 485, 489, 360 S. E. 2d 560, 564 (1987)), she would not have violated the Equal Protection Clause. A violation of state law does not by itself constitute a violation of the Federal Constitution. We made that clear in *Snowden* v. *Hughes*, 321 U. S. 1 (1944), for instance, where a candidate for state office complained that members of the local canvassing board had refused to certify his name as a nominee to the Secretary of State, thus violating an Illinois statute. Because the plaintiff had not alleged, say, that the defendants had meant to discriminate against him on racial grounds, but merely that they had failed to comply with a statute, we rejected the argument that the defendants had thereby violated the Equal Protection Clause.

"[N]ot every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another. . . . [W]here the official action purports to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not

without more a denial of the equal protection of the laws." *Id.*, at 8.

See also *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362 (1940).

The Court today promises not to have overruled *Snowden,* see *ante,* at 16, n. 8, but its disclaimer, I think, is in vain. For if, as the Court suggests, what made the assessor's method unreasonable was her supposed violation of state law, the Court's interpretation of *Allegheny Pittsburgh* recasts in this case the proposition that we had earlier rejected. See Glennon, 58 Geo. Wash. L. Rev., at 268–269; Cohen, 38 UCLA L. Rev., at 93–94; Ely, Another Spin on *Allegheny Pittsburgh,* 38 UCLA L. Rev. 107, 108–109 (1990). In repudiating *Snowden,* moreover, the Court threatens settled principles not only of the Fourteenth Amendment but of the Eleventh. We have held that the Eleventh Amendment bars federal courts from ordering state actors to conform to the dictates of state law. *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89 (1984). After today, however, a plaintiff might be able to invoke federal jurisdiction to have state actors obey state law, for a claim that the state actor has violated state law appears to have become a claim that he has violated the Constitution. See Cohen, *supra,* at 103; Ely, *supra,* at 109–110 ("[B]y the Court's logic, all violations of state law—at least those violations that end (as most do) in the treatment of some people better than others—are theoretically convertible into violations of the Equal Protection Clause").

I understand that the Court prefers to distinguish *Allegheny Pittsburgh,* but in doing so, I think, the Court has left our equal protection jurisprudence in disarray. The analysis appropriate to this case is straightforward. Unless a classification involves suspect classes or fundamental rights, judicial scrutiny under the Equal Protection Clause demands only a conceivable rational basis for the challenged state distinction. See *Fritz, supra; Kassel* v. *Consolidated Freight-*

*ways Corp. of Del.*, 450 U. S. 662, 702–706, and n. 13 (1981) (REHNQUIST, J., dissenting). This basis need not be one identified by the State itself; in fact, States need not articulate any reasons at all for their actions. See *ibid.* Proposition 13, I believe, satisfies this standard—but so, for the same reasons, did the scheme employed in Webster County. See Brief for Pacific Legal Foundation et al. as *Amici Curiae* 7, 9–10, Brief for National Association of Counties et al. as *Amici Curiae* 9–13, and Brief for Respondent 31–32, in *Allegheny Pittsburgh Coal Co.* v. *County Comm'n of Webster County*, O. T. 1988, Nos. 87–1303, 87–1310; *ante*, at 11–14. *Allegheny Pittsburgh* appears to have survived today's decision. I wonder, though, about its legacy.

*       *       *

I concur in the judgment of the Court and join Part II–A of its opinion.

JUSTICE STEVENS, dissenting.

During the two past decades, California property owners have enjoyed extraordinary prosperity. As the State's population has mushroomed, so has the value of its real estate. Between 1976 and 1986 alone, the total assessed value of California property subject to property taxation increased tenfold.[1] Simply put, those who invested in California real estate in the 1970's are among the most fortunate capitalists in the world.

Proposition 13 has provided these successful investors with a tremendous windfall and, in doing so, has created se-

---

[1] Glennon, Taxation and Equal Protection, 58 Geo. Wash. L. Rev. 261, 270, n. 49 (1990). "For the same period, [property values in] Hawaii rose approximately 450%; Washington, D. C. approximately 350%; and New York approximately 125%." *Ibid.* (citing 2. U. S. Dept. of Commerce, Bureau of Census, Taxable Property Values 86–111 (1987) (Table 12); 2 U. S. Dept. of Commerce, Bureau of Census, Taxable Property Values and Assessment/Sales Price Ratios 42 (1977) (Table 2)).

vere inequities in California's property tax scheme.[2] These property owners (hereinafter Squires) are guaranteed that, so long as they retain their property and do not improve it, their taxes will not increase more than 2% in any given year. As a direct result of this windfall for the Squires, later purchasers must pay far more than their fair share of property taxes.

The specific disparity that prompted petitioner to challenge the constitutionality of Proposition 13 is the fact that her annual property tax bill is almost five times as large as that of her neighbors who own comparable homes: While her neighbors' 1989 taxes averaged less than $400, petitioner was taxed $1,700. App. 18–20. This disparity is not unusual under Proposition 13. Indeed, some homeowners pay 17 times as much in taxes as their neighbors with comparable property. See *id.*, at 76–77. For vacant land, the disparities may be as great as 500 to 1. App. to Pet. for Cert. A7. Moreover, as Proposition 13 controls the taxation of commercial property as well as residential property, the regime greatly favors the commercial enterprises of the Squires, placing new businesses at a substantial disadvantage.

As a result of Proposition 13, the Squires, who own 44% of the owner-occupied residences, paid only 25% of the total taxes collected from homeowners in 1989. Report of Senate Commission on Property Tax Equity and Revenue to the California State Senate 33 (1991) (Commission Report). These disparities are aggravated by §2 of Proposition 13, which exempts from reappraisal a property owner's home and up to $1 million of other real property when that property is transferred to a child of the owner. This exemption can be invoked repeatedly and indefinitely, allowing the Proposition 13 windfall to be passed from generation to generation. As the California Senate Commission on Property Tax Equity and Revenue observed:

---

[2] Proposition 13 was codified as Article XIIIA of the California Constitution; for convenience sake, however, I refer to it by its colloquial name.

"The inequity is clear. One young family buys a new home and is assessed at full market value. Another young family inherits its home, but pays taxes based on their parents' date of acquisition even though both homes are of identical value. Not only does this constitutional provision offend a policy of equal tax treatment for taxpayers in similar situations, it appears to favor the housing needs of children with homeowner-parents over children with non-homeowner-parents. With the repeal of the state's gift and inheritance tax in 1982, the rationale for this exemption is negligible." Commission Report 9–10.

The commission was too generous. To my mind, the rationale for such disparity is not merely "negligible," it is nonexistent. Such a law establishes a privilege of a medieval character: Two families with equal needs and equal resources are treated differently solely because of their different heritage.

In my opinion, such disparate treatment of similarly situated taxpayers is arbitrary and unreasonable. Although the Court today recognizes these gross inequities, see *ante*, at 7, n. 2, its analysis of the justification for those inequities consists largely of a restatement of the benefits that accrue to long-time property owners. That a law benefits those it benefits cannot be an adequate justification for severe inequalities such as those created by Proposition 13.

## I

The standard by which we review equal protection challenges to state tax regimes is well established and properly deferential. "Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356, 359 (1973). Thus, as the Court today notes, the issue in this case is "whether the difference in

treatment between newer and older owners rationally furthers a legitimate state interest." *Ante*, at 11.[3]

But deference is not abdication and "rational-basis scrutiny" is still scrutiny. Thus we have, on several recent occasions, invalidated tax schemes under such a standard of review. See, *e. g., Allegheny Pittsburgh Coal Co.* v. *County Comm'n of Webster Cty.*, 488 U. S. 336 (1989); *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612, 618 (1985); *Williams* v. *Vermont*, 472 U. S. 14 (1985); *Metropolitan Life Ins. Co.* v. *Ward*, 470 U. S. 869 (1985); cf. *Zobel* v. *Williams*, 457 U. S. 55, 60–61 (1982).

Just three Terms ago, this Court unanimously invalidated Webster County, West Virginia's assessment scheme under rational-basis scrutiny. Webster County employed a *de facto* Proposition 13 assessment system: The county assessed recently purchased property on the basis of its purchase price but made only occasional adjustments (averaging 3–4% per year) to the assessments of other properties. Just as in this case, "[t]his approach systematically produced dramatic differences in valuation between . . . recently transferred property and otherwise comparable surrounding land." *Allegheny Pittsburgh*, 488 U. S., at 341.

The " '[i]ntentional systematic undervaluation,' " *id.*, at 345, found constitutionally infirm in *Allegheny Pittsburgh* has been codified in California by Proposition 13. That the discrimination in *Allegheny Pittsburgh* was *de facto* and the discrimination in this case *de jure* makes little difference. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the

---

[3] As the Court notes, *ante*, at 10, petitioner contends that Proposition 13 infringes on the constitutional right to travel and that, accordingly, a more searching standard of review is appropriate. There is no need to address that issue because the gross disparities created by Proposition 13 do not pass even the most deferential standard of review. Cf. *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612, 618 (1985); *Zobel* v. *Williams*, 457 U. S. 55, 60–61 (1982).

State's jurisdiction against intentional and arbitrary discrimination, *whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.*" *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350, 352–353 (1918) (emphasis added). If anything, the inequality created by Proposition 13 is constitutionally more problematic because it is the product of a statewide policy rather than the result of an individual assessor's maladministration.

Nor can *Allegheny Pittsburgh* be distinguished because West Virginia law established a market-value assessment regime. Webster County's scheme was constitutionally invalid not because it was a departure from *state law,* but because it involved the relative " 'systematic undervaluation . . . [of] property *in the same class* ' " (as that class was defined by state law). *Allegheny Pittsburgh,* 488 U. S., at 345 (emphasis added). Our decisions have established that the Equal Protection Clause is offended as much by the arbitrary delineation of classes of property (as in this case) as by the arbitrary treatment of properties within the same class (as in *Allegheny Pittsburgh*). See *Brown-Forman Co.* v. *Kentucky,* 217 U. S. 563, 573 (1910); *Cumberland Coal Co.* v. *Board of Revision of Tax Assessments of Greene County,* 284 U. S. 23, 28–30 (1931). Thus, if our unanimous holding in *Allegheny Pittsburgh* was sound—and I remain convinced that it was—it follows inexorably that Proposition 13, like Webster County's assessment scheme, violates the Equal Protection Clause. Indeed, in my opinion, statewide discrimination is far more invidious than a local aberration that creates a tax disparity.

The States, of course, have broad power to classify property in their taxing schemes and if the "classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law." *Brown-Forman Co.* v. *Kentucky,* 217 U. S., at 573. As we stated in *Allegheny Pitts-*

*burgh*, a "State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable." 488 U. S., at 344.

Consistent with this standard, the Court has long upheld tax classes based on the taxpayer's ability to pay, see, *e. g.*, *Fox* v. *Standard Oil Co. of New Jersey*, 294 U. S. 87, 101 (1935); the nature (tangible or intangible) of the property, see, *e. g.*, *Klein* v. *Board of Tax Supervisors of Jefferson County*, 282 U. S. 19, 23–24 (1930); the use of the property, see, *e. g.*, *Clark* v. *Kansas City*, 176 U. S. 114 (1900); and the status (corporate or individual) of the property owner, see, *e. g.*, *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356 (1973). Proposition 13 employs none of these familiar classifications. Instead, it classifies property based on its nominal purchase price: All property purchased for the same price is taxed the same amount (leaving aside the 2% annual adjustment). That this scheme can be named (an "acquisition value" system) does not render it any less arbitrary or unreasonable. Under Proposition 13, a majestic estate purchased for $150,000 in 1975 (and now worth more than $2 million) is placed in the same tax class as a humble cottage purchased today for $150,000. The only feature those two properties have in common is that somewhere, sometime a sale contract for each was executed that contained the price "$150,000." Particularly in an environment of phenomenal real property appreciation, to classify property based on its purchase price is "palpably arbitrary." *Allied Stores of Ohio, Inc.* v. *Bowers*, 358 U. S. 522, 530 (1959).

## II

Under contemporary equal protection doctrine, the test of whether a classification is arbitrary is "whether the difference in treatment between [earlier and later purchasers] rationally furthers a legitimate state interest." *Ante*, at 11.

The adjectives and adverbs in this standard are more important than the nouns and verbs.

A *legitimate* state interest must encompass the interests of members of the disadvantaged class and the community at large, as well as the direct interests of the members of the favored class. It must have a purpose or goal independent of the direct effect of the legislation and one "'that we may reasonably presume to have motivated an impartial legislature.'" *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 452, n. 4 (1985) (STEVENS, J., concurring) (quoting *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 180–181 (1980) (STEVENS, J., concurring in judgment)). That a classification must find justification outside itself saves judicial review of such classifications from becoming an exercise in tautological reasoning.

> "A State cannot deflect an equal protection challenge by observing that in light of the statutory classification all those within the burdened class are similarly situated. The classification must reflect pre-existing differences; it cannot create new ones that are supported by only their own bootstraps. 'The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes.' *Rinaldi* v. *Yeager*, 384 U. S. 305, 308 (1966)." *Williams* v. *Vermont*, 472 U. S., at 27.

If the goal of the discriminatory classification is not independent from the policy itself, "each choice [of classification] will import its own goal, each goal will count as acceptable, and the requirement of a 'rational' choice-goal relation will be satisfied by the very making of the choice." Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205, 1247 (1970).

A classification *rationally* furthers a state interest when there is some fit between the disparate treatment and the legislative purpose. As noted above, in the review of tax

statutes we have allowed such fit to be generous and approximate, recognizing that "rational distinctions may be made with substantially less than mathematical exactitude." *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976). Nonetheless, in some cases the underinclusiveness or the overinclusiveness of a classification will be so severe that it cannot be said that the legislative distinction "rationally furthers" the posited state interest.[4] See, *e. g.*, *Jimenez* v. *Weinberger*, 417 U. S. 628, 636–638 (1974).

The Court's cursory analysis of Proposition 13 pays little attention to either of these aspects of the controlling standard of review. The first state interest identified by the Court is California's "interest in local neighborhood preservation, continuity, and stability." *Ante*, at 12 (citing *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926)). It is beyond question that "inhibit[ing the] displacement of lower income families by the forces of gentrification," *ante*, at 12, is a legitimate state interest; the central issue is whether the disparate treatment of earlier and later purchasers *rationally furthers* this goal. Here the Court offers not an analysis, but only a conclusion: "By permitting older owners to pay progressively less in taxes than new owners of comparable property, [Proposition 13] rationally furthers this interest." *Ibid.*

I disagree. In my opinion, Proposition 13 sweeps too broadly and operates too indiscriminately to "rationally further" the State's interest in neighborhood preservation. No doubt there are some early purchasers living on fixed or limited incomes who could not afford to pay higher taxes and

---

[4] "Herod, ordering the death of all male children born on a particular day because one of them would some day bring about his downfall, employed such a[n overinclusive] classification[, as did t]he wartime treatment of American citizens of Japanese ancestry [which imposed] burdens upon a large class of individuals because some of them were believed to be disloyal." Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341, 351 (1949).

still maintain their homes. California has enacted special legislation to respond to their plight.[5] Those concerns cannot provide an adequate justification for Proposition 13. A statewide, across-the-board tax windfall for *all* property owners and their descendants is no more a "rational" means for protecting this small subgroup than a blanket tax exemption for all taxpayers named Smith would be a rational means to protect a particular taxpayer named Smith who demonstrated difficulty paying her tax bill.

Even within densely populated Los Angeles County, residential property comprises less than half of the market value of the property tax roll. App. 45. It cannot be said that the legitimate state interest in preserving neighborhood character is "rationally furthered" by tax benefits for owners of commercial, industrial, vacant, and other nonresidential properties.[6] It is just short of absurd to conclude that the legitimate state interest in protecting a relatively small

---

[5] As pointed out in the Commission Report, California has addressed this specific problem with specific legislation. The State has established two programs:

*"Senior Citizens Property Tax Assistance.* Provides refunds of up to ninety-six percent of property taxes to low income homeowners over age 62.

*"Senior Citizens Property Tax Postponement.* Allows senior citizens with incomes under $20,000 to postpone all or part of the taxes on their homes until an ownership change occurs." Commission Report 23.

[6] The Court's rationale for upholding Proposition 13 does not even arguably apply to vacant property. That, as the Court recognizes, Proposition 13 discourages changes of ownership means that the law creates an impediment to the transfer and development of such property no matter how socially desirable its improvement might be. It is equally plain that the competitive advantage enjoyed by the Squires who own commercial property is wholly unjustified. There is no rational state interest in providing those entrepreneurs with a special privilege that tends to discourage otherwise desirable transfers of income-producing property. In a free economy, the entry of new competitors should be encouraged, not arbitrarily hampered by unfavorable tax treatment.

number of economically vulnerable families is "rationally furthered" by a tax windfall for all 9,787,887 property owners[7] in California.

The Court's conclusion is unsound not only because of the lack of numerical fit between the posited state interest and Proposition 13's inequities but also because of the lack of logical fit between ends and means. Although the State may have a valid interest in preserving some neighborhoods,[8] Proposition 13 not only "inhibit[s the] displacement" of settled families, it also inhibits the transfer of unimproved land, abandoned buildings, and substandard uses. Thus, contrary to the Court's suggestion, Proposition 13 is not like a zoning system. A zoning system functions by recognizing different uses of property and treating those different uses differently. See *Euclid* v. *Ambler Realty Co.*, 272 U. S., at 388–390. Proposition 13 treats all property alike, giving *all* owners tax breaks, and discouraging the transfer or improvement of *all* property—the developed and the dilapidated, the neighborly and the nuisance.

In short, although I agree with the Court that "neighborhood preservation" is a legitimate state interest, I cannot agree that a tax windfall for all persons who purchased property before 1978 *rationally* furthers that interest. To my mind, Proposition 13 is too blunt a tool to accomplish such a

---

[7] Brief for California Assessors' Association as *Amicus Curiae* 2.

[8] The ambiguous character of this interest is illustrated by the options faced by a married couple that owns a three- or four-bedroom home that suited their family needs while their children lived at home. After the children have moved out, increased taxes and maintenance expenses would—absent Proposition 13—tend to motivate the sale of the home to a younger family needing a home of that size, or perhaps the rental of a room or two to generate the income necessary to pay taxes. Proposition 13, however, subsidizes the wasteful retention of unused housing capacity, making the sale of the home unwise and the rental of the extra space unnecessary.

specialized goal. The severe inequalities created by Proposition 13 cannot be justified by such an interest.[9]

The second state interest identified by the Court is the "reliance interests" of the earlier purchasers. Here I find the Court's reasoning difficult to follow. Although the protection of reasonable reliance interests is a legitimate governmental purpose, see *Heckler* v. *Mathews*, 465 U. S. 728, 746 (1984), this case does not implicate such interests. A reliance interest is created when an individual justifiably acts under the assumption that an existing legal condition will persist; thus reliance interests are most often implicated when the government provides some benefit and then acts to eliminate the benefit. See, *e. g., New Orleans* v. *Dukes*, 427 U. S. 297 (1976). In this case, those who purchased property before Proposition 13 was enacted received no assurances that assessments would only increase at a limited rate; indeed, to the contrary, many purchased property in the hope that property values (and assessments) would appreciate substantially and quickly. It cannot be said, therefore, that the earlier purchasers of property somehow have a reliance interest in limited tax increases.

Perhaps what the Court means is that post-Proposition 13 purchasers have less reliance interests than pre-Proposition

---

[9] Respondents contend that the inequities created by Proposition 13 are justified by the State's interest in protecting property owners from taxation on unrealized appreciation. The California Supreme Court relied on a similar state interest. See *Amador Valley Joint Union High School Dist.* v. *State Bd. of Equalization*, 22 Cal. 3d 208, 236–238, 583 P. 2d 1281, 1309–1311 (1978). This argument is closely related to the Court's reasoning concerning "neighborhood preservation"; respondents claim the State has an interest in preventing the situation in which "skyrocketing real estate prices . . . driv[e] property taxes beyond some taxpayers' ability to pay." Brief for Respondents 19. As demonstrated above, whatever the connection between acquisition price and "ability to pay," a blanket tax windfall for all early purchasers of property (and their descendants) is simply too overinclusive to "rationally further" the State's posited interest in protecting vulnerable taxpayers.

13 purchasers. The Court reasons that the State may tax earlier and later purchasers differently because

> "an existing owner rationally may be thought to have vested expectations in his property or home that are more deserving of protection than the anticipatory expectations of a new owner at the point of purchase. A new owner has full information about the scope of future tax liability before acquiring the property, and if he thinks the future tax burden is too demanding, he can decide not to complete the purchase at all. By contrast, the existing owner, already saddled with his purchase, does not have the option of deciding not to buy his home if taxes become prohibitively high." *Ante,* at 12–13.[10]

This simply restates the effects of Proposition 13. A pre-Proposition 13 owner has "vested expectations" in reduced taxes *only* because Proposition 13 gave her such expectations; a later purchaser has no such expectations because Proposition 13 does not provide her such expectations. But the same can be said of any arbitrary protection for an existing class of taxpayers. Consider a law that establishes that homes with even street numbers would be taxed at twice the rate of homes with odd street numbers. It is certainly true that the even-numbered homeowners could not decide to "unpurchase" their homes and that those considering buying an even-numbered home would know that it came with an extra tax burden, but certainly that would not justify the arbitrary imposition of disparate tax burdens based on house numbers. So it is in this case. Proposition 13 provides a benefit for earlier purchasers and imposes a burden on later purchasers. To say that the later purchasers know what they are getting into does not answer the critical question: Is it reasonable

---

[10] The Court's sympathetic reference to "existing owner[s] already saddled" with their property should not obscure the fact that these early purchasers have already seen their property increase in value more than tenfold.

and constitutional to tax early purchasers less than late purchasers when at the time of taxation their properties are comparable? This question the Court does not answer.

Distilled to its essence, the Court seems to be saying that earlier purchasers can benefit under Proposition 13 because earlier purchasers benefit under Proposition 13. If, however, a law creates a disparity, the State's interest preserving that disparity cannot be a *"legitimate* state interest" justifying that inequity. As noted above, a statute's disparate treatment must be justified by a purpose *distinct* from the very effects created by that statute. Thus, I disagree with the Court that the severe inequities wrought by Proposition 13 can be justified by what the Court calls the "reliance interests" of those who benefit from that scheme.[11]

In my opinion, it is irrational to treat similarly situated persons differently on the basis of the date they joined the class of property owners. Until today, I would have thought this proposition far from controversial. In *Zobel* v. *Williams*, 457 U. S. 55 (1982), we ruled that Alaska's program of distributing cash dividends on the basis of the recipient's years of residency in the State violated the Equal Protection Clause. The Court wrote:

"If the states can make the amount of a cash dividend depend on length of residence, what would preclude varying university tuition on a sliding scale based on years of residence—or even limiting access of finite pub-

---

[11] Respondents, drawing on the analysis of the California Supreme Court, contend that the inequities created by Proposition 13 are also justified by the State's interest in "permitting the taxpayer to make more careful and accurate predictions of future tax liability." *Amador Valley*, 22 Cal. 3d, at 239, 583 P. 2d, at 1312. This analysis suffers from the same infirmity as the Court's "reliance" analysis. I agree that Proposition 13 permits greater predictability of tax liability; the relevant question, however, is whether the inequities between earlier and later purchasers created by Proposition 13 can be justified by something other than the benefit to the early purchasers. I do not believe that they can.

lic facilities, eligibility for student loans, for civil service jobs, or for government contracts by length of domicile? *Could states impose different taxes based on length of residence?* Alaska's reasoning could open the door to state apportionment of other rights, benefits, and services according to length of residency. It would permit the states to divide citizens into expanding numbers of permanent classes. Such a result would be clearly impermissible." *Id.*, at 64 (emphasis added) (footnotes omitted).

Similarly, the Court invalidated on equal protection grounds New Mexico's policy of providing a permanent tax exemption for Vietnam veterans who had been state residents before May 8, 1976, but not to more recent arrivals. *Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612 (1985). The Court expressly rejected the State's claim that it had a legitimate interest in providing special rewards to veterans who lived in the State before 1976 and concluded that "[n]either the Equal Protection Clause, nor this Court's precedents, permit the State to prefer established resident veterans over newcomers in the retroactive apportionment of an economic benefit." *Id.*, at 623.

As these decisions demonstrate, the selective provision of benefits based on the timing of one's membership in a class (whether that class be the class of residents or the class of property owners) is rarely a "legitimate state interest." Similarly situated neighbors have an equal right to share in the benefits of local government. It would obviously be unconstitutional to provide one with more or better fire or police protection than the other; it is just as plainly unconstitutional to require one to pay five times as much in property taxes as the other for the same government services. In my opinion, the severe inequalities created by Proposition 13 are arbitrary and unreasonable and do not rationally further a legitimate state interest.

Accordingly, I respectfully dissent.