**[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 74.]**

ZALUD OLDSMOBILE PONTIAC, INC., APPELLANT, *v.* TRACY, TAX COMMR.,
APPELLEE.

JACK SCHMIDT LEASE, INC., APPELLANT, *v.* TRACY, TAX COMMR., APPELLEE.

[Cite as *Zalud Oldsmobile Pontiac, Inc. v. Tracy*, 1996-Ohio-90.]

*Taxation—Franchise tax—R.C. 5733.041 allows a deduction of depreciation add-*
*backs from net income only for taxpayers who paid the tax on the net*
*income basis in the years generating the deduction.*

(Nos. 95-1447 and 95-1690—Submitted September 10, 1996—Decided
November 6, 1996.)

APPEALS from the Board of Tax Appeals, Nos. 94-M-24 and 94-M-13.

————————————

{¶ 1} In case No. 95-1447, which we have consolidated with case No. 95-1690, Zalud Oldsmobile Pontiac, Inc., appellant, did not pay its 1982 through 1987 franchise taxes on the net income basis, one of the two bases on which a corporation calculates its franchise tax. In calculating this basis, however, Zalud added back to net income amounts representing portions of its federal accelerated depreciation, as prescribed by R.C. 5733.041. For Zalud's 1988 and 1989 franchise tax returns, it deducted parts of these "depreciation add-backs"; it then paid the franchise tax on the net income basis.

{¶ 2} However, the Tax Commissioner, appellee, denied these deductions. He found that R.C. 5733.041 permitted these deductions only for taxpayers who had paid the tax on the net income basis in the years generating the deduction. On appeal, the Board of Tax Appeals ("BTA") affirmed the commissioner's order.

{¶ 3} In case No. 95-1690, Jack Schmidt Lease, Inc., appellant, paid the minimum tax for its 1984 through 1987 franchise taxes and did not pay on the net income basis. In calculating the net income basis, nevertheless, Schmidt added

back to net income portions of its federal accelerated appreciation. As had Zalud, Schmidt deducted parts of these "depreciation add-backs" in its 1988 through 1990 franchise tax returns; it paid the tax on the net income basis in such years.

{¶ 4} After the commissioner denied these deductions, Schmidt filed refund claims. The commissioner denied the claims, and the BTA, on appeal, affirmed the commissioner's order.

{¶ 5} These causes are now before this court upon appeals as of right.

_____

*Yu, Stromberg, Huotari & Cleveland, P.C.*, and *Michael M. Schmidt*, for appellant Zalud Oldsmobile Pontiac, Inc.

*Ricketts & Onda Co., L.P.A., Robert J. Onda* and *Robert S. Naylor*, for appellant Jack Schmidt Lease, Inc.

*Betty D. Montgomery*, Attorney General, and *Richard C. Farrin,* Assistant Attorney General, for appellee.

_____

***Per Curiam.***

{¶ 6} Appellants argue that R.C. 5733.041 allows them to deduct these depreciation add-back amounts from their net income in the disputed tax years. They also argue, alternatively, that denying them the deductions violates the federal Equal Protection Clause and Ohio's Uniformity Clause. We disagree and affirm the BTA's decisions.

{¶ 7} "R.C. 5733.01 imposes a tax on corporations for the privilege of exercising their franchise in Ohio. This tax is computed on the value of the taxpayer's issued and outstanding shares of stock, calculated on either the net worth or net income basis, whichever produces the greater tax. R.C. 5733.06.     * * *" *Cohen & Co. v. Limbach* (1988), 40 Ohio St.3d 52, 53, 531 N.E.2d 699, 700.

{¶ 8} In computing the net income basis, "*** the taxable income that is required to be reported for federal purposes is also the net income for the Ohio

franchise tax." *Id.* at 53, 531 N.E.2d at 701. R.C. 5733.041 prescribes the disputed adjustments to net income:

"Notwithstanding division (I) of section 5733.04 of the Revised Code, 'net income' means net income as defined in that division subject to the following adjustments:

"(A) For each of the tax years 1984 to 1988, in the case of a corporation whose 1982 franchise tax was charged on the base calculated under division (B) of section 5733.05 of the Revised Code [net income basis], deduct one-fifth of the amount of the adjustment [depreciation add-back], if any, required by division (A)(1) of this section as it existed prior to July 1, 1983 for tax year 1982.

"(B) For each of the tax years 1985 to 1989, in the case of a corporation whose 1983 franchise tax was charged on the base calculated under division (B) of section 5733.05 of the Revised Code, deduct one-fifth of the amount of the adjustment required by division (B)(1) of this section as it existed prior to July 1, 1983 for tax year 1983.

"(C) For each of the tax years 1984 to 1988:

"(1) Add twenty-five per cent of the amount by which the corporation's federal taxable income before operating loss deduction and special deductions was reduced for the taxable year by any depreciation taken on recovery property for which the depreciation was determined under section 168 of the Internal Revenue Code.

"(2) For each of the five ensuing tax years following a tax year for which an addition was made under division (C)(1) of this section and for which the corporation's tax was charged on the base calculated under division (B) of section 5733.05 of the Revised Code, deduct one-fifth of the amount of such addition.

"(D)(1) For tax year 1989, add twenty per cent of the amount by which the corporation's federal taxable income before operating loss deduction and special deductions was reduced for the taxable year by any depreciation taken on recovery

property for which the depreciation was determined under section 168 of the Internal Revenue Code.

"(2) For each of the tax years 1990 to 1993, where an addition was made under division (D)(1) of this section and where the corporation's tax for tax year 1989 was charged on the base calculated under division (B) of section 5733.05 of the Revised Code, deduct one-fourth of the amount of such addition. * * *"

{¶ 9} Despite appellants' arguments that the court should interpret R.C. 5733.041 to allow them to deduct portions of the add-back in the tax years in question, the statute is clear. In the years prior to the disputed tax years, a taxpayer had to add back a percentage of federal accelerated depreciation in calculating its franchise tax. Second, if it paid the tax on the net income basis in those years, it may deduct portions of this add-back in subsequent years. In the prior years, appellants paid the minimum franchise tax or paid it on their net worth, not on their net income, and, consequently, failed to satisfy the conditions of this statute that authorizes the deductions. We must apply a statute that is clear and unambiguous in its terms; we do not interpret it. *Soltesiz v. Tracy* (1996), 75 Ohio St.3d 477, 479, 663 N.E.2d 1273, 1275.

{¶ 10} Moreover, *S. Cent. Bell Tel. Co. v. Celauro* (Tenn. 1988), 754 S.W. 2d 605, cited for support by appellants, does not apply here. Tennessee's corporate excise tax recognizes two depreciation systems in subtracting from income a gain or loss on the sale or disposition of property having a higher Tennessee basis than federal basis. This difference in bases could occur, according to the decision, if the corporation used the accelerated cost recovery system ("ACRS") for federal income tax and slower depreciation methods for Tennessee corporate excise tax.

{¶ 11} Ohio, on the other hand, does not calculate a separate deduction for a differential in federal basis and state basis when a taxpayer disposes of property. Ohio accepts and then adjusts federal adjusted gross income, despite how the corporation computes depreciation, in calculating the franchise tax on the net

income basis. Indeed, Ohio does not, for its net income calculations, have a state basis *vis a vis* a federal basis. Thus, Ohio's and Tennessee's taxes are different, and we need not rely on that Tennessee decision to interpret an Ohio tax statute.

{¶ 12} Appellants' sharper focus is the federal Equal Protection Clause. They argue that disallowing these depreciation deductions for taxpayers that paid franchise tax on the net worth basis while granting the deductions to taxpayers that paid on the net income basis denies them equal protection. The commissioner, on the other hand, maintains that he has treated appellants the same as other taxpayers who are similarly situated, *i.e,* those taxpayers that paid the tax on the net worth or minimum tax basis. The commissioner also maintains that appellants did not negate all rational bases for the classification or sustain their burden to establish that no rational basis existed for the classification.

{¶ 13} The commissioner misses the point; the statute does classify franchise taxpayers into net income and net worth or minimum tax taxpayers. Nevertheless, we hold that the classification does not violate the Equal Protection Clause.

{¶ 14} According to *Nordlinger v. Hahn* (1992), 505 U.S. 1, 10, 112 S.Ct. 2326, 2331-2332, 120 L.Ed.2d 1, 12:

"The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 [40 S.Ct. 560, 561, 64 L. Ed. 989, 990-991] (1920).

"As a general rule 'legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.' *McGowan v. Maryland*, 366 U.S. 420, 425-426 [81 S.Ct. 1101, 1105,

6 L.Ed.2d 393, 398-399] (1961). Accordingly, this Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest. See, *e.g., Cleburne v. Cleburne Living Center, Inc.* 473 U.S. 432, 439-441 [105 S.Ct. 3249, 3254-3255, 87 L.Ed.2d 313, 320-321] (1985); *New Orleans v. Dukes,* 427 U.S. 297, 303 [96 S.Ct. 2513, 2517, 49 L.Ed. 2d 511, 517] (1976)."

{¶ 15} We employ regular equal protection scrutiny here. The classification does not jeopardize the exercise of a fundamental right or categorize on the basis of an inherently suspect characteristic, and appellants do not urge that it does. Thus, we must determine whether classifying taxpayers in this instance into net income taxpayers, who may deduct the depreciation allowances, and net worth or minimum tax taxpayers, who may not, rationally furthers a legitimate state interest.

{¶ 16} The General Assembly first undertook adjusting accelerated depreciation expenses to be allowed by the federal system in Am. Sub. H.B. No. 694 (eff. Nov. 15, 1981), 139 Ohio Laws, Part II, 3460. The Legislative Service Commission's analysis of this bill as introduced, H.B. No. 694, states:

"The federal Economic Recovery Act of 1981 will reduce the net income of many corporations for federal tax purposes by virtue of changes in the rules governing depreciation. Net income for federal tax purposes serves as the basis for computing corporations' taxable income under the Ohio corporation franchise tax. Corporations that pay the Ohio tax based upon their income rather than net worth pay less tax if their net income for federal tax purposes decreases.

"The bill provides that in tax years 1982 and 1983 (1983 and 1984 in the case of certain corporations), net income would be computed under the depreciation methods in effect prior to the enactment of the Economic Recovery Act rather than

under current federal law. If a corporation's franchise tax liability should be increased as a result of this adjustment, one-fifth of the addition to income resulting from the adjustment would be deducted from the corporation's net income in each of the ensuing five years when computing its franchise tax liability."

{¶ 17} Thus, the General Assembly attempted to maintain constant tax revenues and allow a deduction if the depreciation add-back increased the corporation's franchise tax liability calculated on the net income basis.

{¶ 18} Next, in the Tax Reform Act of 1986, Congress "broadened the definition of taxable income by eliminating or reducing several deductions [and, consequently], the tax base for the states was broadened as well." Boucher & Taylor, The Domino Effect: Federal Tax Reform and the States (1987), 6 J. State Taxation., 99, 100. According to Boucher & Taylor, the states could keep the windfall generated by the federal reform or return it to the taxpayers. The authors conclude that Ohio decided to return the windfall, *id*. at 141, by phasing in the federal depreciation scheme "over a five-year period to replace the state's current method of depreciating business property." *Id*. at 158.

{¶ 19} The General Assembly enacted this change in Am. Sub. S.B. No. 417 (eff. Mar. 13, 1987), 141 Ohio Laws, Part I, 1064. See, also, Legislative Service Commission's analysis of this bill when reported by the House Ways & Means Committee.

{¶ 20} Furthermore, Boucher & Taylor maintain, at 121:

"If the states do not conform to the new federal depreciation rules, corporations will be required to maintain four separate depreciation schedules to account properly for depreciation allowable for federal income tax, alternative minimum tax, earnings and profits, and state income tax. Therefore, most of the states that currently use the federal depreciation rules can be expected to adopt the new depreciation provisions in order to reduce the compliance burden on corporations and to simplify the administration of the state's tax system."

**{¶ 21}** Thus, the General Assembly's legitimate purpose was to keep the tax revenues level and return any windfall stemming from the federal reform. The expected increase in tax revenues would come on the net income basis because Congress increased net income by reducing allowed depreciation. Accordingly, the General Assembly rationally allowed taxpayers that paid on such basis to reduce their Ohio taxable income in subsequent years by a portion of the amount that raised taxes in the add-back year. This also is a simpler way to calculate these depreciation amounts instead of examining and then calculating the effect of the depreciation add-back. We rule that these reasons state a rational basis to sustain a legitimate state purpose, the maintenance of level revenues and the return of windfall taxes to corporations paying higher taxes due to the federal depreciation changes.

**{¶ 22}** Appellants also contend that the statute violates the Uniformity Clause, Section 26, Article II, Ohio Constitution. This clause states that "[a]ll laws, of a general nature, shall have a uniform operation throughout the state       * * *."

**{¶ 23}** In *State ex rel. Wirsch v. Spellmire* (1902), 67 Ohio St. 77, 86, 65 N.E. 619, 622, cited in *Put-in-Bay Island Taxing Dist. Auth. v. Colonial, Inc*. (1992), 65 Ohio St.3d 449, 451, 605 N.E.2d 21, 22, and *Austintown Twp. Bd. of Trustees v. Tracy* (1996), 76 Ohio St. 3d 353, 356, 667 N.E. 2d 1174, 1177, the court stated:

"* * * '[U]niform operation throughout the state' means universal operation as to territory; it takes in the whole state. And, as to persons and things, it means universal operation as to all persons and things in the same condition or category. When a law is available in every part of the state as to all persons and things in the same condition or category, it is of uniform operation throughout the state."

**{¶ 24}** As the commissioner contends, this statute applies to all franchise taxpayers throughout the state. All corporations must perform the calculations prescribed in the statute. Each corporation must follow all the rules to determine eligibility to deduct the depreciation amounts. Of course, not all taxpayers qualify

to deduct these depreciation amounts. Nevertheless, the statute has uniform application throughout the state.

**{¶ 25}** Zalud, further, complains that the commissioner did not sign the assessment or respond to all of the claims made in the petition for reassessment. Zalud, then, argues that neither the assessment nor the final determination is valid.

**{¶ 26}** "The action of a public officer, or of a board, within the limits of the jurisdiction conferred upon it by law, is not only presumed to be valid but it is also presumed to be in good faith and in the exercise of sound judgment." *State ex rel. Maxwell v. Schneider* (1921), 103 Ohio St. 492, 498, 134 N.E. 443, 445; *Wheeling Steel Corp. v. Evatt* (1944), 143 Ohio St. 71, 84, 28 O.O. 21, 26, 54 N.E. 2d 132, 138. Since the commissioner has authority to issue this assessment and final determination under R.C. 5703.05 and 5733.11, we presume these orders are valid.

**{¶ 27}** Schmidt argues that Ohio should apply the tax benefits rule of Section 111(a), Title 26, U.S. Code. As the commissioner contends, the federal statute controls the computation of federal income. Once determined, Ohio adopts the federal income to calculate Ohio income. Congress enacted Section 111(a) for the federal tax; Ohio's General Assembly has not enacted a similar statute. We can enforce only those statutes that apply to Ohio's tax system.

**{¶ 28}** Finally, Schmidt maintains that the BTA should have admitted into evidence a letter from an Ohio House of Representatives member to, apparently, an accountant seeking the intent of the Act. The letter had, evidently, been mentioned in opening argument in a previous BTA hearing in a similar matter. Schmidt asserts that the letter sets forth the intent of this statute and is admissible under Evid. R. 803(8) and 1005.

**{¶ 29}** Evid. R. 803(8) excepts public records and reports from the hearsay rule. According to Weissenberger's Ohio Evidence (1996) 415, Section 803.108, "[n]either subdivision (a) nor (b) of Rule 803(8) embraces statements made by persons outside the official agency, *i.e.*, private citizens." Thus, to be admissible

under this rule, the record must be an agency's record, not a statement from someone outside the agency. These latter statements must be evaluated under other rules to determine their admissibility. *Id.* Here, the representative sent the letter, apparently, to a constituent. It is not an official record of the BTA.

{¶ 30} Under Evid. R. 1005, the contents of an official record may be proved by a copy. According to Weissenberger at 617, Section 1005.1, this rule "codifies the Ohio public records exception to the best evidence rule." Thus, the document must be admissible before a copy of it can be substituted. Consequently, neither rule permits admissibility of this letter.

{¶ 31} Accordingly, we affirm the BTA's decisions because they are reasonable and lawful.

*Decisions affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and STRATTON, JJ., concur.

_____